**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Joseph Rudolf Wood, III, | ) No. CV-98-053-TUC-JMR |
| Petitioner, | ) <u>DEATH PENALTY CASE</u> |
| vs. | ) |
| Dora B. Schriro, et al., | ) **MEMORANDUM OF DECISION AND ORDER** |
| Respondents. | ) |

Petitioner Joseph Rudolf Wood, III, filed an Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, alleging that he is imprisoned and sentenced in violation of the United States Constitution. (Dkt. 23.)[1] In an Order dated March 3, 2006, the Court found that the following claims were properly exhausted and would be addressed on the merits: 1-B(1); 1-B(2)(a)-(d); 1-B(5); 1-B(7); 1-C (in part); 5; 9; 10-B; 10-C(1)(a), (b), (c), (e), and (f); 10-C(3)(a), (b), and (d); 10-D (in part); and 11-B (in part). (Dkt. 63.) The parties have completed their briefing on the merits of these claims. (Dkts. 69, 74, 78.) The Court has considered the claims and, for the reasons set forth herein, determines that Petitioner is not entitled to relief.

## BACKGROUND

Petitioner shot and killed his estranged girlfriend, Debra Dietz, and her father, Eugene Dietz, on August 7, 1989, at a Tucson automotive paint and body shop owned and operated

---

[1]     "Dkt." refers to documents in this Court's file.

by the Dietz family.  The Arizona Supreme Court provided the following description of the events surrounding the crimes:

> Since 1984, Defendant and Debra had maintained a tumultuous relationship increasingly marred by Defendant's abusive and violent behavior. Eugene generally disapproved of this relationship but did not actively interfere.  In fact, the Dietz family often included Defendant in dinners and other activities.  Several times, however, Eugene refused to let Defendant visit Debra during business hours while she was working at the shop.  Defendant disliked Eugene and told him he would "get him back" and that Eugene would "be sorry."
>
> Debra had rented an apartment that she shared with Defendant. Because Defendant was seldom employed, Debra supported him financially. Defendant nevertheless assaulted Debra periodically.  She finally tried to end the relationship after a fight during the 1989 July 4th weekend. She left her apartment and moved in with her parents, saying "I don't want any more of this."  After Debra left, Defendant ransacked and vandalized the apartment. She obtained an order of protection against Defendant on July 8, 1989.  In the following weeks, however, Defendant repeatedly tried to contact Debra at the shop, her parents' home, and her apartment.
>
> Debra and Eugene drove together to work at the shop early on Monday morning, August 7, 1989.  Defendant phoned the shop three times that morning.  Debra hung up on him once, and Eugene hung up on him twice. Defendant called again and asked another employee if Debra and Eugene were at the shop.  The employee said that they had temporarily left but would return soon.  Debra and Eugene came back at 8:30 a.m. and began working in different areas of the shop. Six other employees were also present that morning.
>
> At 8:50 a.m., a Tucson Police officer saw Defendant driving in a suspicious manner near the shop.  The officer slowed her patrol car and made eye contact with Defendant as he left his truck and entered the shop.  Eugene was on the telephone in an area where three other employees were working. Defendant waited for Eugene to hang up, drew a revolver, and approached to within four feet of him.  The other employees shouted for Defendant to put the gun away.  Without saying a word, Defendant fatally shot Eugene once in the chest and then smiled.  When the police officer saw this from her patrol car she immediately called for more officers.  Defendant left the shop, but quickly returned and again pointed his revolver at the now supine Eugene.  Donald Dietz, an employee and Eugene's seventy-year-old brother, struggled with Defendant, who then ran to the area where Debra had been working.
>
> Debra had apparently heard an employee shout that her father had been shot and was trying to telephone for help when Defendant grabbed her around the neck from behind and placed his revolver directly against her chest. Debra struggled and screamed, "No, Joe, don't!"  Another employee heard Defendant say, "I told you I was going to do it, I have to kill you."  Defendant then called Debra a "bitch" and shot her twice in the chest.
>
> Several police officers were already on the scene when Defendant left

- 2 -

the shop after shooting Debra.  Two officers ordered him to put his hands up.
Defendant complied and dropped his weapon, but then grabbed it and began
raising it toward the officers.   After again ordering Defendant to raise his
hands, the officers shot Defendant several times.

*State v. Wood*, 180 Ariz. 53, 60-61, 881 P.2d 1158, 1165-66 (1994) (footnotes omitted).

Petitioner was indicted on two counts of first degree murder and two counts of aggravated assault against the officers.  At trial Petitioner did not dispute his role in the killings.  His defense was that he had acted impulsively and without premeditation.  He also disputed the motive ascribed to him by the prosecution, that he attacked the Dietzes because he was upset that Debra Dietz had ended their relationship.

The jury convicted Petitioner on all counts.  The court sentenced him to death for the murders based on two aggravating circumstances, that Petitioner was convicted of one or more other homicides during the commission of the offenses, pursuant to A.R.S. § 13-703(F)(8), and that in the commission of the offenses he knowingly created a grave risk of death to another person, under § 13-703(F)(3).

Petitioner's convictions and sentences were affirmed on direct appeal.  *Wood*, 180 Ariz. 53, 881 P.2d 1158.  Petitioner filed a motion for reconsideration, which was summarily denied.  The United States Supreme Court subsequently denied certiorari.  *Wood v. Arizona*, 515 U.S. 1147 (1995).

On March 1, 1996, Petitioner filed a petition for post-conviction relief ("PCR") pursuant to Rule 32 of the Arizona Rules of Criminal Procedure.  (ROA-PCR 310.)[2] On June

---

[2]   "ROA-PCR" refers to the page number of documents filed in the Arizona Supreme Court during Petitioner's petition for review (Case No. CR 97-0377-PC).  "ROA" refers to the documents filed in the Arizona Supreme Court during Petitioner's direct appeal (Case No. CR 91-0233-AP).  "ME" refers to the minute entries of the trial court.  "RT" refers to the court reporter's transcripts.  Original reporter's transcripts and certified copies of the appellate and post-conviction records were provided to this Court by the Arizona Supreme Court on July 3, 2000.  (Dkt. 47.)

- 3 -

1
2
6, 1997, that petition was denied.[3]  (ME 6/6/97.)  The Arizona Supreme Court summarily denied a petition for review.  Petitioner thereafter commenced this action.

3
**AEDPA STANDARD FOR RELIEF**

4
5
6
7
8
9
10
11
12
Petitioner's habeas claims are governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA).  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'"  *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939-40 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).  The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh,* 521 U.S. at 333 n.7).

13
14
Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

15
16
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

17
18
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

19
28 U.S.C. § 2254(d).

20
21
22
23
24
The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground.  *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).  The relevant state court decision is the last reasoned state decision regarding a claim.  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04

25
26
27
[3]     Pima County Superior Court Judge Thomas Meehan presided over Petitioner's trial and sentencing.  Following Judge Meehan's death, the case was reassigned to Judge Howard Hantman, who presided over the PCR proceedings.

28

(1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review.  "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final.  *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649, 653 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue.  *Williams*, 529 U.S. at 381; *see Musladin*, 127 S. Ct. at 654; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004).  Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably.  *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).  The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result.  *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam).  In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.  For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *Landrigan*, 127 S. Ct. at 1939; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts.  *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).   In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 127 S. Ct. at 1939-40; *Miller-El II*, 545 U.S. at 240.  However, it is only the state court's factual findings, not its ultimate decision, that are subject to § 2254(e)(1)'s presumption of correctness. *Miller-El I,* 537 U.S. at 341-42 ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

As the Ninth Circuit has noted, application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale.

*See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).   In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law.   *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167.   Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision.   *Pirtle*, 313 F.3d at 1167 (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.   Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed de novo, because in that circumstance "there is no state court decision on [the] issue to which to accord deference."   *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012, 1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

## DISCUSSION

In addition to the standards discussed above, the Court's review of Petitioner's claims is guided by two fundamental, related principles.   The first of these concerns the limited role of habeas review and recognizes that "[d]irect review is the principal avenue for challenging a conviction."   *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993).   Therefore, as the Supreme Court has explained:

> When the process of direct review . . .   comes to an end, a presumption of finality and legality attaches to the conviction and sentence.   The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited.   Federal courts are not forums in which to relitigate state trials.

*Barefoot v. Estelle,* 463 U.S. 880, 887 (1983).

The second principle is that, in the context of habeas review, an error at trial is harmless unless it had a "'substantial and injurious effect or influence in determining the jury's verdict.'"   *Brecht v. Abrahamson,* 507 U.S. at 637 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776 (1946)).   Therefore, trial errors are often found harmless where the record is replete with overwhelming evidence of the petitioner's guilt.   *See Neder v. United States,*

527 U.S. 1, 18-19 (1999).

As noted, in the instant case premeditation was the only contested issue with respect to the first degree murder charges.[4] This Court agrees with the Arizona Supreme Court's finding that the element of premeditation was supported by a "clear quantum of evidence." *Wood*, 180 Ariz. at 65, 881 P.2d at 1170. Thus, the Court's analysis of Petitioner's conviction-related claims is informed by the strength of the evidence of his guilt of first degree murder.

## I.  Prosecutorial Misconduct

Petitioner alleges that the prosecutor engaged in prejudicial misconduct throughout his trial in violation of his rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments. The appropriate standard of federal habeas review for a claim of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)) (petitioner not entitled to relief in the absence of a due process violation even if the prosecutor's comments were "undesirable or even universally condemned"). Therefore, in order to succeed on these claims, Petitioner must prove not only that the prosecutor's remarks and other conduct were improper but that they

---

[4]     Under A.R.S. § 13-1105(A)(1), "A person commits first degree murder if: Intending or knowing that the person's conduct will cause death, the person causes the death of another person . . . with premeditation." A defendant kills with premeditation if he "acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion." A.R.S. § 13-1101(1). A period of reflection of "any length of time" after forming the intent to kill is sufficient to show premeditation. *Clabourne v. Lewis*, 64 F.3d 1373, 1380 (9th Cir. 1995). Premeditation may be proven by circumstantial evidence, including "threats made by the defendant to the victim, a pattern of escalating violence between the defendant and the victim, or the acquisition of a weapon by the defendant before the killing." *State v. Thompson*, 204 Ariz. 471, 479, 65 P.3d 420, 428 (2003) (because premeditation can rarely be established by direct evidence, "the state may use all circumstantial evidence at its disposal to prove premeditation").

- 8 -

1   "so infected the trial with unfairness as to make the resulting conviction a denial of due

2   process." *Id.*; *see Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (relief on such claims

3   is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted

4   in actual prejudice) (citing *Brecht v. Abrahamson*, 507 U.S. at 637-38); *Smith v. Phillips*, 455

5   U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged

6   prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").

7   ### A.    Cross-Examination of Dr. Allender re: Hypnosis & Truth Serum

8   Petitioner alleges in Claim 1-B(1) that the prosecutor engaged in misconduct during

9   his cross-examination of Petitioner's mental health expert, Dr. James Allender, a

10  neuropsychologist, by asking Dr. Allender if he had used hypnosis or "truth serum" to assess

11  whether Petitioner's reported amnesia regarding the crime was genuine.  (Dkts. 24 at 4-20,

12  69 at 5-7.)  Petitioner contends that this line of inquiry was improper because it included

13  questions about Petitioner's failure to take tests whose results were inadmissible, invited the

14  jury to make inferences about that failure, and constituted an improper comment on his right

15  to remain silent and not to inculpate himself under the Fifth Amendment.

16  Background

17  Prior to trial, defense counsel moved for a Rule 11 competency examination.  (ROA

18  33.)  Dr. Catherine Boyer, a psychologist, conducted a pre-Rule 11 evaluation and prepared

19  a report.  (ROA-PCR 1212-18.)  Larry Morris, a psychologist, and Barry Morenz, a

20  psychiatrist, conducted Rule 11 examinations. (ROA-PCR 1220-26, 1228-31.)  Drs. Morris

21  and Morenz concluded that Petitioner was competent to stand trail.  (*Id.*)  Both experts noted

22  that Petitioner reported no memory of the events surrounding the shootings.  (*Id.*)  Dr. Morris

23  opined that the memory loss could have been the result of a dissociative episode, induced by

24  the trauma of the shootings, or the product of malingering.  (*Id.* at 1225-26.)  Dr. Morris

25  indicated that he was "unable to differentiate between these possibilities" but that "[p]erhaps

26  an additional examination using hypnosis or an amobarbital interview may assist in this

27  

28  

- 9 -

1    regard." (*Id.* at 1226.)

2          Petitioner maintained that he had no memory of the events surrounding the shootings.

3    To support the theory that he acted impulsively and without premeditation in killing the

4    victims, Petitioner presented the testimony of Dr. Allender.  Dr. Allender testified that he

5    could eliminate "organicity" or "brain damage" as the cause of Petitioner's purported

6    memory loss.  (RT 2/22/91 at 153.)  He then explained:

7                I think the two most probable explanations for the memory gap would
             then be either an unconscious defense mechanism where he's trying to repress
8            negative events and therefore he can't remember them.  Or an alternative
             explanation is that he is malingering or he's faking it because it might be to his
9            advantage to not remember and he may think it is to his advantage not to
             remember.
10

11   (*Id.*)  When asked by defense counsel whether he believed that Petitioner's memory loss was

12   genuine, Dr. Allender replied:

13               I think it is difficult for me to really separate out whether it is an
             unconscious process that causes him to keep the memories out of his
14           awareness or whether it is something that he thinks it is to his advantage to not
             talk about.  For me it is difficult to be conclusive on one side of the fence or
15           the other.  I think there was evidence in testing that he has this denial and
             repression as a mechanism that he used at times, it is hard to say he's using it
16           specifically at this time.

17   (*Id.* at 153-54.)

18         On cross-examination, the prosecutor engaged Dr. Allender in the following colloquy

19   concerning the authenticity of Petitioner's reported memory loss:

20      Q.    There are other tests available are there not to assist you in attempting
             to ascertain if someone is being truthful?
21

22      A.    There are some tests, the MMPI has a subscale that looks at an
             individual's approach to the testing.

23      Q.    And in fact you had the opportunity to read Dr. Morris's report?

24      A.    I did and I got the raw data for his MMPI.

25      Q.    Didn't Dr. Morris suggest that hypnosis or amobarbital might be ideal
             to discover whether this defendant was malingering?
26

27      A.    He suggested that those might be techniques.

28
                                      - 10 -

Q.    With hypnosis, you place them under hypnosis in order to find out what the truth of the matter was?

A.    What the theory would be is if it is an unconscious process, that you can probably do hypnosis or use the sodium amobarbital to get past the conscious defense or unconscious defense mechanisms.

Q.    So you didn't, did you attempt, did you request a hypnosis evaluation?

A.    I didn't because I'm not as convinced about those techniques as Dr. Morris.

Q.    Amobarbital, is that a truth serum?

A.    That is what they call it, that is what people have called it along the way.

(*Id.* at 173-74.)  The prosecutor then moved on to questions about the tests Dr. Allender did administer.  Petitioner did not testify.

<u>Analysis</u>

On direct appeal, the Arizona Supreme Court held that the prosecutor's cross-examination of Dr. Allender did not constitute misconduct.  The court noted that the prosecutor's questions about hypnosis and "truth serum" were in reference to techniques suggested by Dr. Morris.  In rejecting this claim, the court explained:

> Defendant claims this exchange prejudiced him much like questioning a defendant about refusing to take a polygraph test.  It is true that, as with polygraph test results, courts generally exclude testimony induced or "refreshed" by drugs or hypnosis. *Jeffers,* 135 Ariz. at 431, 661 P.2d at 1132; *State v. Mena,* 128 Ariz. 226, 228-29, 624 P.2d 1274, 1276-77 (1981).  Defendant's analogy, however, is misguided.  The prosecutor's cross-examination was not intended to impugn Defendant but to test the basis and credibility of Dr. Allender's opinions concerning whether Defendant was faking his asserted memory loss at the time of the murders.  Dr. Morris had examined Defendant and recommended the disputed testing.  Dr. Allender relied in part on Dr. Morris's written evaluation in forming his own opinions about Defendant.  Without reaching the issue of admissibility of expert testimony based upon the results of hypnotic or amobarbital examination of a subject, we conclude the prosecutor acted within the wide latitude permitted on cross-examination. *Stabler,* 162 Ariz. at 374, 783 P.2d at 820.

*Wood*, 1180 Ariz. at 67-68, 881 P.2d at 1172-72.

This decision was neither contrary to nor an unreasonable application of clearly established federal law.  As the Arizona Supreme Court noted, this portion of the

- 11 -

prosecutor's cross-examination was intended to test the credibility of Dr. Allender's testimony about the cause of Petitioner's reported memory loss. *Id.* In conducting the cross-examination, the prosecutor questioned Dr. Allender about the information he had reviewed, including Dr. Morris's report, which recommended that Petitioner's claim of memory loss be subjected to testing through hypnosis or amobarbital. (*Id.*; *see* RT 2/22/91 at 173-74.) Because Dr. Allender had relied on Dr. Morris's report, the prosecutor was attempting to discover the reasons Dr. Allender did not pursue the testing recommended by Dr. Morris. The issue addressed by the prosecutor's questions was whether Petitioner was malingering with respect to his claim of memory loss; the issue was not the ultimate one of Petitioner's state of mind at the time of the shootings and whether he truly acted impulsively rather than with premeditation. Because he claimed no memory of the events, the truthfulness of his version of the shootings was never an issue; therefore, the prosecutor's questions about truth serum and hypnosis were not a challenge to Petitioner's theory of impulsivity. If, as Petitioner asserts, the prosecutor was not referring to the truth-seeking methods described in Dr. Morris's report, but instead was simply trying to prejudice Petitioner with references to inadmissible information, presumably he also would have asked Dr. Allender why he did not subject Petitioner to a polygraph examination.

For the same reason, the prosecutor's cross-examination of Dr. Allender did not implicate Petitioner's Fifth Amendment rights or prejudice his fair trial rights. The prosecutor's questions did not violate Petitioner's right to remain silent. Petitioner did not testify at trial; nor could he have given testimony concerning the central issue in the case – his state of mind at the time of the shootings – because he asserted that he had no memory of those events. Nothing in the prosecutor's examination of Dr. Allender on the issue of memory loss could have altered that circumstance.

Petitioner contends that the answers prompted by the prosecutor's improper questions left the jury with the impression that Dr. Allender "was either incompetent or attempting to

deceive them by failing to gather evidence that would have greatly informed their decision." (Dkt. 69 at 7.)  To the contrary, in answering the prosecutor's questions, Dr. Allender supplied the reasonable explanation that he did not employ hypnosis or administer amobarbital because he was skeptical of those techniques.  (RT 2/22/91 at 174.)  In addition, despite his equivocations about the cause of Petitioner's memory loss, Dr. Allender testified in support of the key defense theory, that Petitioner acted on impulse rather than with reflection when he shot the victims.  In his testimony, Dr. Allender described the tests he administered to Petitioner.  He then expressed his conclusion that Petitioner "appeared to be an individual that would act in an impulsive fashion, responding more to emotions rather than thinking things out" (*id.* at 153), adding that "[t]here's no doubt in my mind that he will act impulsively" (*id.* at 190).  He further testified that Petitioner "demonstrate[d] a tendency to have his reality testing deteriorate when faced with emotionally charged stimuli"; in such situations, "his judgment and interpretation of events would become clouded."  (*Id.* at 152.) Moreover, Dr. Allender's opinion concerning Petitioner's impulsiveness was supported by the testimony of several lay witnesses.  (*See*, *e.g.*, RT 2/22/91 at 59-60, 72, 80, 88.)

Petitioner's due process and Fifth Amendment rights were not violated by the prosecutor's cross-examination of Dr. Allender.  The decision of the Arizona Supreme Court denying this claim was neither contrary to nor an unreasonable application of clearly established federal law.

### B.   Bad Character Evidence

Petitioner alleges in Claim 1-B(2) that the prosecutor engaged in misconduct by eliciting inadmissible "bad character" evidence that Petitioner (a) had previously been arrested, (b) had a bad employment record, (c) had been unfaithful to his girlfriends, and (d) had a self-centered relationship with Debra Dietz.  (Dkts. 24 at 20-29, 69 at 7-9.) Respondents contend, inter alia, that none of this evidence prejudiced Petitioner because it was not inconsistent with, and in some cases supported, the defense theory based on

1   Petitioner's character trait of impulsivity.  (Dkt. 74 at 13.)

2        Of these allegations, the Arizona Supreme Court addressed only the first – i.e., the

3   prosecutor's allusion to Petitioner's prior conviction – as a claim of prosecutorial

4   misconduct.  The state supreme court, adopting the analytical framework suggested by

5   Petitioner's opening appellate brief, addressed the remaining allegations as claims of

6   evidentiary error.  For the purposes of this Court's analysis, however, the same standard

7   applies whether the claim is that Petitioner's rights were violated by the "court's action in

8   admitting the evidence [or] the prosecutor's action in presenting the evidence." *Sweet v.*

9   *Delo*, 125 F.3d 1144, 1154 (8th Cir. 1997).  The issue is whether the prosecutor's conduct

10  – which resulted in the admission of the challenged testimony – deprived Petitioner of a fair

11  trial.[5]  *Id.*

12       As described in more detail below, along with the applicable principles of habeas

13  review and the provisions of the AEDPA, several factors lead to the conclusion that

14  Petitioner was not deprived of a fair trial and is not entitled to habeas relief.  First, there was

15  strong evidence that the killings were premeditated.  *See Wood*, 180 Ariz. at 63-64, 881 P.2d

16  at 1168-69.  In addition, under the defense theory of impulsivity, much of the evidence

17  concerning Petitioner's prior conduct was not harmful to his case and was in fact consistent

18  with the presentation of Petitioner as an individual who was quick to anger and acted

19  reflexively.  Finally, the harmful effect of the contested testimony was limited by the fact that

20  Petitioner's credibility was not an issue; he did not testify at trial and did not remember the

21  events surrounding the shootings.  *See Hodge v. Hurley*, 426 F.3d 368, 388 (6th Cir. 2005)

22  (noting that "derogatory statements and bad-character arguments are particularly likely to be

23  prejudicial in a case . . . depending almost entirely on a determination of whether the

24

25

26       [5]   Because there is no state court ruling on these claims, this Court's review is de
27  novo.  *Pirtle*, 313 F.3d at 1167.  The same standard applies to the remaining prosecutorial
    misconduct claims, Claims 1-B(5), 1-B(7), and 1-C.

28

1   defendant or an accuser is a more credible witness").

2      Prior Arrest

3      Defense counsel filed and the trial court granted a motion in limine to exclude

4   evidence of Petitioner's prior conviction.  (ROA 191-201; ME 2/19/91 at 2.)  On direct

5   examination, counsel asked Dr. Allender what materials he had reviewed in preparing to

6   examine Defendant.  Dr. Allender replied, in part, "a variety of police reports from the

7   Tucson Police Department, as well as from the Las Vegas Police Department." (RT 2/22/91

8   at 146.)  During the prosecutor's cross-examination of Dr. Allender, the following exchange

9   occurred:

> Q.    Directing your attention, you said you had some Las Vegas police reports?
>
> A.    Yes.
>
> Q.    You had police reports from 1979?
>
> A.    I believe I did. I would have to flip through and look for it if you want me to.
>
> Q.    Do you recall in 1979 an incident when he was arrested for some criminal activity?
>
> A.    I think I found a report from '79 from Las Vegas.

(RT 2/22/91 at 161.)  There was no further testimony concerning the incident.

      The Arizona Supreme Court found that Petitioner was not entitled to relief based upon

this line of questioning:

> Defendant alleges this was improper because the trial court had ruled inadmissible Defendant's 1979 Las Vegas misdemeanor assault conviction. On cross-examination, however, the prosecutor simply asked Dr. Allender to elaborate on the reports he first mentioned on direct examination.  The jury never learned the details of the conduct underlying Defendant's Las Vegas arrest.  Because Dr. Allender relied on the reports in forming his opinion of Defendant, the prosecutor's cross-examination was proper.
>
> Defendant was entitled, however, to a limiting instruction that references to the Las Vegas police reports were admissible only to show the basis of Dr. Allender's opinions. *See Lundstrom,* 161 Ariz. at 148, 776 P.2d at 1074.  Defense counsel did not request such an instruction.  On this record, we conclude that the absence of such an instruction did not deprive Defendant of a fair trial.  There was no fundamental error.

- 15 -

1   *Wood*, 180 Ariz. at 66, 881 P.2d at 1171.

2          This ruling does not entitle Petitioner to habeas relief.  In general, state law matters,

3   including a trial court's evidentiary rulings, are not proper grounds for habeas corpus relief.

4   "[I]t is not the province of a federal habeas court to reexamine state-court determinations on

5   state-law questions.  In conducting habeas review, a federal court is limited to deciding

6   whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*

7   *v. McGuire,* 502 U.S. 62, 67-68 (1991) (internal quotation omitted); *see Jammal v. Van de*

8   *Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  The Arizona Supreme Court having determined

9   that the cross-examination was proper, this Court's role is limited to deciding whether

10  admission of the testimony was so prejudicial as to offend due process.

11         The United States Supreme Court has "very narrowly" defined the category of

12  infractions that violate the due process test of fundamental fairness. *Dowling v. United States*,

13  493 U.S. 342, 352 (1990).  Pursuant to this narrow definition, the Court has declined to hold,

14  for example, that evidence of other crimes or bad acts is so extremely unfair that its

15  admission violates fundamental conceptions of justice.  *Estelle v. McGuire*, 502 U.S. at 75

16  & n.5; *Spencer v. Texas,* 385 U.S. 554, 563-64 (1967).  Thus, there is no clearly established

17  Supreme Court precedent which holds that a state violates due process by admitting evidence

18  of prior bad acts.  *See Bugh v. Mitchell,* 329 F.3d 496 (6th Cir. 2003).  In *Bugh*, the Sixth

19  Circuit held that the state court decision allowing admission of evidence pertaining to the

20  petitioner's alleged prior, uncharged acts of child molestation was not contrary to clearly

21  established Supreme Court precedent because there was no such precedent holding that the

22  state violated due process by permitting propensity evidence in the form of other bad acts

23  evidence.  *Id.* at 512-13; *see also Alberni v. McDaniel*, 458 F.2d 860, 863 (9th Cir. 2006) (no

24  clearly established federal law forbidding the use of propensity evidence as violative of due

25  process, citing *Estelle v. McGuire*, 502 U.S. at  75 n.5).

26         The admission of testimony alluding to the Las Vegas arrest did not violate

27

28                                          - 16 -

1   Petitioner's due process rights.

2   <u>Behavioral Evidence</u>

3   As noted above, the Arizona Supreme Court did not specifically address these

4   allegations as claims of prosecutorial conduct. Instead, the claims were raised and rejected

5   as instances evidentiary error, with the supreme court holding that the testimony was either

6   properly admitted or did not prejudice Petitioner. For example, the court addressed and

7   denied the claim that the trial court erroneously admitted information concerning Petitioner's

8   employment history:

> On appeal, Defendant objects for the first time to the admission of
> testimony revealing that Defendant had been fired from two jobs, once for
> fighting with a co-worker and once due to his "temperament." Because these
> claims were not raised below, we review only for fundamental error. *West*,
> 176 Ariz. at 445, 862 P.2d at 204. Arguably, this testimony concerns prior bad
> acts inadmissible under Rule 404. The state claims Defendant made a tactical
> decision not to object to the testimony because it tended to show Defendant's
> impulsivity. We decline to resolve the issue, however, because even if the
> testimony was erroneously admitted, its admission does not rise to the level of
> fundamental error. The testimony in both instances was perfunctory and
> undetailed. Moreover, there was other compelling evidence of Defendant's ill
> temper, much of it introduced by Defendant himself on the issue of
> impulsivity.

16   *Id.* at 65, 881 P.2d at 1170.

17   The supreme court's characterization of evidence concerning Petitioner's checkered

18   employment history applies as well to the admission of testimony that Petitioner was "self-

19   centered," discourteous, and unfaithful to Debra Dietz. Such evidence did not deny

20   Petitioner a fair trial. Given the defense argument that Petitioner had no motive to kill Ms.

21   Dietz because their relationship was intact, information concerning the nature of that

22   relationship was relevant. In addition, evidence concerning other aspects of Petitioner's

23   behavior toward Ms. Dietz was not overly prejudicial when viewed in the context of

24   properly-admitted evidence that Petitioner was physically abusive and that she feared him

25   and wanted to end the relationship. *Wood*, 180 Ariz. at 62, 881 P.2d at 1167; *see also Ortiz*

26   *v. Stewart*, 149 F.3d 923, 934-37 (9th Cir. 1998) (alleged incidents of prosecutorial

27

28

- 17 -

misconduct, including "inflammatory" questioning of a child witness about her fear of the petitioner, did not render the proceedings fundamentally unfair when viewed in the "larger context" of the trial).  Furthermore, the prosecutor's conduct was far less egregious than that which occurred in *Washington v. Hofbauer*, 228 F.3d 689, 699-701 (6th Cir. 2000), relied on by Petitioner, where the prosecutor not only attacked the defendant's character but repeatedly misrepresented crucial facts and vouched for the credibility of the witnesses whose testimony was the sole evidence of the defendant's guilt.  Finally, any prejudice from the admission of the contested evidence was reduced by the testimony of other witnesses who indicated that Petitioner and Debra Dietz had a loving relationship and that she willingly provided him financial support.  (RT 2/22/91 at 91.)  Therefore, Petitioner is not entitled to relief on this claim.

### C.    Cross-Examination of Dr. Allender re: Mental State

Petitioner alleges in Claim 1-B(5) that the prosecutor improperly questioned Dr. Allender about Petitioner's mental state at the time of the crime.  (Dkts. 24 at 37-40, 69 at 9-10.)  This claim refers to the following portion of the prosecutor's cross-examination of Dr. Allender:

> Q.    Let me ask you, sir, I don't know, you are talking about impulsivity here today.  Of the defendant.  You said the defendant has a trait of acting impulsively?
>
> A.    That's my belief, yes.
>
> Q.    Under the facts of this case as you understand them, sir, how would a person who was not impulsive have committed this offense?
>
> A.    Had it been thought through and premeditated, then I would say that it was not impulsive.  I see impulsivity as acting without forethought.
>
> Q.    Well, how would a non-impulsive person have committed this offense?
>
> A.    I think they would have planned it out.
>
> Q.    So what you are saying is that this wasn't planned out, from what you know about the facts of this case it wasn't planned?
>
> A.    It is hard for me to say whether it is planned.  Well, I think Mr. Wood

> behaved in a general sequence but given his lack of recall for the specific offense, it is hard to know whether this is planned out or not.

(RT 2/22/91 at 165-66.)

Prior to trial, the court and counsel discussed the parameters of Dr. Allender's testimony. (RT 2/19/91 at 22-24.) The discussion concluded with the court explaining that Dr. Allender's testimony would be subject to the holding in *State v. Christensen*, 129 Ariz. 32, 35-36, 628 P.2d 580, 583-84 (1981) – that is, Dr. Allender would be allowed to testify about Petitioner's character trait of impulsivity but not to testify that Petitioner was or was not acting impulsively at the time of the shootings, and that the State would be allowed, with some exceptions, to present evidence inconsistent with the character trait of impulsivity. (*Id.* at 23-24.)

The cross-examination was not improper; it simply asked the expert to describe how a non-impulsive person would have committed this double-homicide. While the prosecutor's questions arguably implicated the issue of Petitioner's state of mind at the time of the crimes, Dr. Allender's answers did not deprive Petitioner of a fair trial. Dr. Allender's testimony with respect to the ultimate issue of premeditation was simply that he was not certain if Petitioner had "planned out" the shootings. Given the constraints imposed by Petitioner's lack of memory of the incident, together with the evidence describing Petitioner's behavior during the shootings, Dr. Allender's testimony, though not unconditionally favorable to Petitioner, was accurate and did not conflict with the defense theory. Therefore, Petitioner is not entitled to relief on this claim.

### D.    Cross-Examination of Mona Donovan re: Mental State

Petitioner alleges in Claim 1-B(7) that he is entitled to habeas relief because the prosecutor engaged in misconduct by eliciting testimony from defense witness Mona Donovan regarding Petitioner's mental state at the time of the crime after the court had ruled the question improper. (Dkts. 24 at 42-43, 69 at 10-11.)

On direct examination by defense counsel, Ms. Donovan testified that Petitioner acted

impulsively at times.  (RT 2/22/91 at 88.)  As an example, she cited the occasion when he

vandalized the apartment he and Debra Dietz had shared and destroyed some of her

possessions. (*Id.* at 96.) On cross-examination, the prosecutor asked Ms. Donovan about her

previous statement indicating that Petitioner would not become "instantly" violent but that

his anger would magnify as a situation worsened.  (*Id.* at 108.)  The following exchange then

occurred, which Petitioner characterizes as involving prosecutorial misconduct:

> Q:    When [Petitioner] trashed the apartment, he trashed the apartment to get
> some of his possessions and avenge his anger?  I was reading the
> question [defense counsel] asked you on page 11, do you know why he
> broke in?  Answer, to get some of his possessions, to avenge some of
> his anger by breaking possessions of [Debra's]. Do you recall that?
>
> A:    Yes.
>
> Q:    In fact I think there was a telephonic interview that you gave to a legal
> assistant in my office on the 9th of October, do you recall when you
> were asked why he did that, indicating that he probably, he was
> probably very angry and did it out of spite?
>
> A:    I don't recall the telephone conversation.
>
> Q:    Does that sound like something you would say?
>
> A:    I really don't know, I don't remember.
>
> Q:    Would you agree with that statement?
>
> A:    That he would do it out of spite?
>
> The Court:    Let's quit asking this witness, the witness why this defendant
> did or didn't know why he did something, there's no way she
> could know it.
>
> Q:    You indicated did you not that he avenged some of his anger by
> breaking and destroying some possessions of [Debra's]?
>
> A:    Yes.
>
> The Court:    Did you hear what I just said, quit asking her about his mental
> state. Quit asking her about his mental state.
>
> Q:    Well, when you say the word avenge, what do you mean by the word
> avenge? Do you mean to get revenge?
>
> A:    Yeah, I guess so.

- 20 -

1   (*Id.* at 108-10.)

2       This testimony, while not flattering to Petitioner, did not prejudice his defense.  First,

3   the fact that Petitioner had vandalized Debra Dietz's apartment was already established.

4   (*See, e.g.*, RT 2/20/91 at 112-13.)  In addition, the information elicited by the prosecutor was

5   not inconsistent with the defense theory that the shootings were the product of Petitioner's

6   impulsivity and anger-control problems.  Moreover, the trial court effectively overruled, sua

7   sponte, the prosecutor's questions, ameliorating any prejudice from counsel's failure to

8   object and limiting any improper focus on the specifics of Petitioner's state of mind.  Finally,

9   Ms. Donovan's testimony regarding Petitioner's motives in vandalizing the apartment was

10  equivocal and at most tangentially related to the issue of Petitioner's state of mind at the time

11  of the shootings, further limiting any potential harm to the defense.  Petitioner is not entitled

12  to relief on this claim.

13      **E.    Cumulative Impact**

14      Petitioner alleges in Claim 1-C that his constitutional rights were violated by the

15  cumulative impact of the alleged prosecutorial misconduct asserted in the previously-

16  discussed claims.  (Dkts. 24 at 46-50, 69 at 11-16.)  In addressing claims based on the

17  cumulative impact of instances prosecutorial misconduct, courts compare the cumulative

18  effect of the alleged misconduct as balanced against the strength of admissible evidence of

19  guilt.  *See United States v. Beeks*, 224 F.3d 741, 745 (8th Cir. 2000); *United States v.*

20  *Cormier*, 468 F.3d 63, 74 (1st Cir. 2006); *Malicoat v. Mullin*, 426 F.3d 1241, 1263 (10th Cir.

21  2005).  For example, in *United States v. Wallace*, 848 F.2d 1464, 1475-76 (9th Cir. 1988),

22  the Ninth Circuit, noting the "centrality of the credibility contest between the defendants and

23  the co-conspirator witnesses," held that the prejudicial effect of the prosecutorial misconduct

24  was exacerbated by the fact that the conviction rested entirely on uncorroborated testimony

25  and that the cumulative misconduct implicated the credibility of the co-conspirators.  *See*

26  *also United States v. Frederick,* 78 F.3d 1370, 1381 (9th Cir. 1996) (holding that cumulative

27

28                                              - 21 -

1  effect of errors was prejudicial where "evidence against the defendant was not overwhelming

2  and the case was a close one").

3      In Petitioner's case, by contrast, the evidence of guilt on the only contested issue –

4  premeditation – was very strong.  Consisting of eyewitness accounts of Petitioner's conduct

5  during the shootings, an undisputed history of violence by Petitioner against Debra Dietz,

6  and taped messages in which Petitioner threatened her life, the strength of the evidence was

7  unaffected by any aspect of the prosecutor's conduct.  *See Jackson v. Calderon*, 211 F.3d

8  1148, 1161 (9th Cir. 2000) (finding no prejudice from cumulated deficiencies of counsel's

9  performance where evidence of premeditation was persuasive).  This scenario stands in stark

10  contrast to the situation addressed in *Hodge v. Hurley*, 426 F.3d at 388-89, relied upon by

11  Petitioner.  In any event, the alleged misconduct, if misconduct at all, was de minimis.

12      **F.      Conclusion**

13      Given the nature and context of the alleged misconduct, which involved neither

14  misrepresentation of the facts nor vouching for witnesses, together with the strong evidence

15  of Petitioner's guilt, the prosecutor's conduct did not "so infect[] the trial with unfairness as

16  to make the resulting conviction a denial of due process."  *Darden*, 477 U.S. at 181; *see also*

17  *Ortiz*, 149 F.3d at 937; *Turner v. Marshall*, 63 F.3d 807, 818 (9th Cir. 1995).

18  **II.    Confrontation Clause Violation**

19      Petitioner alleges in Claim 5 that the trial court violated his confrontation rights under

20  the Sixth Amendment by admitting into evidence several out-of-court statements made by

21  the decedents. (Dkts. 24 at 69-80, 69 at 16-20.)  These included statements by Debra Dietz

22  concerning her fear of Petitioner and her desire to end their relationship and Eugene Dietz's

23  comments about his antagonistic relationship with Petitioner.  A number of witnesses,

24  including neighbors, family members, and police officers, testified to these statements.  The

25  testimony was admitted after the trial court denied Petitioner's pretrial motion to suppress

26  all hearsay testimony relating to statements by Debra Dietz and despite defense counsel's

27

28

1    continuing objection to such testimony.

2        Background

3        The Arizona Supreme Court rejected this claim on direct appeal.  The court held that

4    the statements were either properly admitted under the state's evidentiary rules or, where

5    erroneously admitted, did not deprive Petitioner of a fair trial or violate his Confrontation

6    Clause rights.  *Wood*, 180 Ariz. at 62-65, 881 P.2d at 1167-70.  The court first explained that

7    the testimony regarding Debra Dietz's fear of Petitioner and her wish to end their relationship

8    was relevant and admissible pursuant to Arizona Rule of Evidence 803(3)[6]:

9
10           The statements about Debra's fear and desire to end the relationship
         helped explain Defendant's motive.  The disputed trial issues were
11       Defendant's *motive* and *mental state* – whether Defendant acted with
         premeditation or as a result of a sudden impulse.  The prosecution theorized
12       that Defendant was motivated by anger or spite engendered by Debra's
         termination of the  relationship.  Debra's statements were relevant because
13       they showed her intent to end the relationship, which in turn provided a
         plausible motive for premeditated murder.  In addition, Debra's statements
14       were also relevant to refute Defendant's assertion that he and Debra had
         secretly maintained their relationship after July 4, 1989.

15           . . . Although hearsay, these statements fall within a well-established
16       exception allowing admission of hearsay statements concerning the declarant's
         then-existing state of mind, emotion, or intent, if the statements are not offered
17       to prove the fact remembered or believed by the declarant.  Ariz.R.Evid. 803(3).

18           Debra's statements were not offered to prove any fact.  Instead, they
         related solely to her state of mind when the statements were made and thus fit
19       within the Rule 803(3) exception.  The trial court did not err in admitting this
         testimony.

20   *Id.* at 62-63, 881 P.2d at 1167-68 (citations and footnote omitted).  The court reached the

21

22   _____

23       [6]   Rule 803(3) of the Arizona Rules of Evidence provides, in relevant part, that
     the following statements are not excluded by the hearsay rule:
24

25       **(3) Then existing mental, emotional, or physical condition.**  A statement of
26       the declarant's then existing state of mind, emotion, sensation, or physical
         condition (such as intent, plan, motive, design, mental feeling, pain, and bodily
27       health), but not including a statement of memory or belief to prove the fact
         remembered or believed . . .

28                                      - 23 -

same conclusion with respect to statements made by Eugene Dietz concerning the animosity between he and Defendant, finding that they were relevant and properly admitted under Rule 803(3).  *Id.* at 64-65, 881 P.2d at 1169-70.

The state supreme court found that other statements were improperly admitted but that their admission constituted harmless error.  The first of these statements occurred during the State's direct examination of a neighbor who lived next door to Petitioner and Debra Dietz:

> Q.    Did she [Debra] ever have another conversation with you later on when she related the same information to you?
>
> A.    Yes, she did.  I remember that instance very clearly . . . she told me that she did not want to stay at the apartment because Joe had threatened her life.

(RT 2/20/91 at 46-47.)

The Arizona Supreme Court held that this statement "falls outside the state of mind exception and should not have been admitted."  *Wood*, 180 Ariz. at 63, 881 P.2d at 1168. The court then reviewed the statement's erroneous admission under the harmless error standard:

> We review a trial court's erroneous admission of testimony under a harmless error standard. *Bible,* 175 Ariz. at 588, 858 P.2d at 1191.  Unless an error amounts to a structural defect, it is harmless if we can say "beyond a reasonable doubt that the error had no influence on the jury's judgment." *Id.; see also Sullivan v. Louisiana,* 508 U.S. 275, ----, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) (error is only harmless if guilty verdict "was surely unattributable to the error").  We consider particular errors in light of the totality of the trial evidence. *State v. White,* 168 Ariz. 500, 508, 815 P.2d 869, 877 (1991), *cert. denied,* 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992).  An error that requires reversal in one case may be harmless in another due to the fact-specific nature of the inquiry. *Bible,* 175 Ariz. at 588, 858 P.2d at 1191.
>
> Premeditation was the key trial issue, and we recognize that a prior threat is relevant to that issue.  Premeditation requires proof that the defendant "made a decision to kill prior to the act of killing." *State v. Kreps,* 146 Ariz. 446, 449, 706 P.2d 1213, 1216 (1985).  The interval, however, can be short. *Id.*  Either direct or circumstantial evidence may prove premeditation. *State v. Hunter,* 136 Ariz. 45, 48, 664 P.2d 195, 198 (1983).
>
> Initially, we note that a tendency to act impulsively in no way precludes a finding of legal premeditation.  Defendant offered little evidence to support

- 24 -

his claim that he acted without premeditation on the morning of the murders. A defense expert briefly testified that Defendant displayed no signs of organic brain damage or psychotic thinking. The essence of his testimony militating against premeditation was that Defendant "appeared to be an individual that would act in an impulsive fashion, responding more to emotions rather than thinking things out." This expert, however, examined Defendant for a total of six hours more than thirteen months after the murders, and there was no testimony correlating this trait to Defendant's conduct on August 7, 1989. Other witnesses testified that Defendant had, at various times, acted violently for no apparent reason. These instances usually occurred, however, when Defendant had been abusing alcohol or drugs. There was no evidence that Defendant consumed alcohol or drugs before the murders.

There was, on the other hand, a great deal of evidence that unequivocally compels the conclusion that Defendant acted with premeditation. *See Bible,* 175 Ariz. at 588, 858 P.2d at 1191. Defendant disliked and had threatened Eugene. Three days before the killing, Defendant left threatening phone messages with Debra showing his intent to harm her. Defendant called the shop just before the killings and asked whether Debra and Eugene were there. Although Defendant regularly carried a gun, on the morning of the murders he also had a spare cartridge belt with him, contrary to his normal practice. Defendant calmly waited for Eugene to hang up the telephone before shooting him. There was no evidence that Eugene did or said anything to which Defendant might have impulsively responded. Finally, Defendant looked for Debra after shooting Eugene, found her in a separate area, and held her before shooting her, stating, "I told you I was going to do it, I have to kill you."

The hearsay statement about threats came from the state's first witness on the first day of a five-day trial. The prosecutor neither emphasized it nor asked the witness to elaborate. Nor did the prosecutor mention the statement in closing argument. *Cf. Charo,* 156 Ariz. at 563, 754 P.2d at 190 (noting prosecution's emphasis of improperly-admitted evidence during closing argument in finding reversible error). We note, also, that other statements, properly admitted, established that Defendant had threatened Debra on other occasions. We stress that this court cannot and does not determine an error is harmless merely because the record contains sufficient untainted evidence. *Bible,* 175 Ariz. at 590, 858 P.2d at 1193. Given this record, however, we are convinced beyond a reasonable doubt that the statement did not influence the finding of premeditation implicit in the verdict. *See State v. Coey,* 82 Ariz. 133, 142, 309 P.2d 260, 269 (1957) (finding no reversible error in admission of hearsay statement bearing on pre-meditation). The error was harmless.

*Id.* at 63-64, 881 P.2d at 1168-69 (footnote omitted).

The Arizona Supreme Court next considered the testimony of a witness who recounted Eugene Deitz's statement that "Nobody is going to stop [Petitioner] until he kills somebody," determining that it too fell outside the state-of-mind exception and was therefore erroneously admitted. *Id.* at 65, 881 P.2d at 1170. The court concluded, however, that

admission of the statement, which was not objected to, did not deprive Petitioner of a fair

trial under a fundamental error analysis:

> Error is only fundamental if it goes to the essence of a case, denies the defendant a right essential to a defense, or is of such magnitude that the defendant could not have received a fair trial. *State v. Cornell,* 179 Ariz. 314, 329, 878 P.2d 1352, 1367 (1994).
>
> The "essence" of this case was Defendant's mental state at the time of the murders. Eugene's statement of belief does not clearly establish premeditation nor refute Defendant's defense of impulsivity. Given the clear quantum of evidence supporting premeditation, admission of this lone statement did not deprive Defendant of a fair trial. *See id.* at 51. We conclude that admission of Eugene's hearsay statement does not meet the "stringent standard" of fundamental error. *Bible,* 175 Ariz. at 573, 858 P.2d at 1176.

*Id.* 65, 881 P.2d at 1170.

Finally, the Arizona Supreme Court considered and rejected Petitioner's claim that

admission of the hearsay statements violated his Sixth Amendment rights, holding that

"[t]here is no Confrontation Clause violation when the hearsay testimony of a deceased

declarant is admitted pursuant to a firmly-rooted hearsay exception" such as the Rule 803(3)

state-of-mind exception. *Wood*, 180 Ariz. at 64, 881 P.2d at 1169 (citing *White v. Illinois,*

502 U.S. 346, 356 (1992)). The court further explained that "a Confrontation Clause

violation can be harmless error" and that the trial court's erroneous admission of two of the

decedents' statements constituted harmless error. *Id.* (citing *Harrington v. California*, 395

U.S. 250, 253 (1969)).

Analysis

State law violations, such as violations of the Arizona Rules of Evidence, do not

generally provide grounds for habeas relief. *See Estelle v. McGuire*, 502 U.S. at 67-68;

*Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). Therefore, this Court need not consider

Petitioner's assertion that the trial court misapplied state evidentiary rules when it admitted

the statements under Rule 803(3). However, a state court's evidentiary ruling becomes

subject to federal habeas review when the ruling violates federal law, either by infringing

upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Estelle v. McGuire*, 502 U.S. at 68; *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Hayes v. York*, 311 F.3d 321, 324-25 (4th Cir. 2002); *Jammal v. Van de Kamp,* 926 F.2d at 919-20. Petitioner contends that the admission of the statements violated his rights under the Confrontation Clause of the Sixth Amendment. As noted, the Arizona Supreme Court disagreed, finding that the statements were properly admitted under the firmly-rooted state-of-mind exception or were erroneously admitted but did not deprive Petitioner of a fair trial. This Court must determine if that ruling involved an unreasonable application of clearly established federal law.

At the time of Petitioner's conviction, the controlling law was defined by *Ohio v. Roberts*, which held that the Confrontation Clause allowed the admission of hearsay evidence against criminal defendants if it fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 66 (1980); *see White*, 502 U.S. at 356. The state-of-mind exception was a firmly-rooted hearsay exception and the admission of such testimony did not, as a general rule, violate the Confrontation Clause. *See, e.g.*, *Horton v. Allen*, 370 F.3d 75, 85 (1st Cir. 2004). Subsequently, in *Crawford v. Washington,* 541 U.S. 36 (2004), the Supreme Court expressly overruled *Roberts* and held that it is a violation of the Sixth Amendment Confrontation Clause to admit testimonial evidence at trial unless the declarant is unavailable and there was a prior opportunity to cross-examine him or her. 541 U.S. at 68. In *Whorton v. Bockting*, however, 127 S. Ct. 1173, 1184 (2007), the Supreme Court concluded that *Crawford* does not apply retroactively to cases on collateral review.

As already noted, in considering this claim on direct appeal the Arizona Supreme Court applied the holdings in *Roberts* and *White*. Because these cases were the controlling precedent at the time, and because *Crawford* cannot be applied retroactively, the Arizona Supreme Court's decision is reviewed under the "unreasonable application" standard of §

- 27 -

1   2254(d)(1).[7]

2       Regardless of whether the challenged statements were erroneously admitted under

3   Arizona's evidentiary rules, this Court agrees with the Arizona Supreme Court that Petitioner

4   was not prejudiced by their admission.  The evidence of premeditation was strong.  Petitioner

5   left ten messages on Debra Dietz's answering machine on the night of Friday, August 4,

6   1989, three days before the killings.  Some of the messages included threats:  "Debbie, I'm

7   sorry I have to do this.  I hope someday somebody will understand when we're not around

8   no more.  I do love you babe.  I'm going to take you with me."  *See Wood*, 180 Ariz. at 60

9   n.2, 881 P.2d at 1165 n.2. Just prior to the killings, Petitioner phoned the auto shop to see if

10  Eugene and Debra Dietz were present.  *Id.* at 64, 881 P.2d at 1169.  While holding onto Ms.

11  Dietz immediately before shooting her, Petitioner stated, "I told you I was going to do it, I

12  have to kill you."  *Id.*  Immediately after the killings, Petitioner repeated that "if he and

13  Debra couldn't be together in life, they would be together in death."  *Id.* at 63, n.6, 881 P.2d

14  at 1168, n.6.

15      Moreover, the statements were cumulative of other, properly admitted testimony

16  concerning the victims' relationship with Petitioner.  *See Apanovitch v. Houk*, 466 F.3d 460,

17  486-88 (6th Cir. 2006).  In *Apanovitch*, the Sixth Circuit, on habeas review, ruled that the

18  trial court's admission of hearsay testimony from six witnesses regarding the murder victim's

19  state of mind, including her fear of the defendant, did not deprive the defendant of a fair trial.

20

---

21      [7]     In any event, all but two of the challenged statements were nontestimonial and

22  therefore not subject to the principles of *Crawford*. *See Crawford*, 541 U.S. at 51-52
    (defining testimonial statements as those "made under circumstances which would lead an

23  objective witness reasonably to believe that the statement would be available for use at a later
    trial," and distinguishing a "formal statement to government officers" from "a casual remark

24  to an acquaintance"); *see also Horton v. Allen*, 370 F.3d at 83-84.

25      Petitioner contends that the remaining statements were testimonial because they were
    made by Debra to police officers.  However, because the ruling in *Crawford* does not apply

26  retroactively, the state court's decision to admit the statements does not entitle Petitioner to

27  relief.

28                                  - 28 -

*Id.* at 487-88.  Some of the testimony was admitted in error, with the witnesses improperly extending their testimony beyond the victim's state of mind to her description of the behavior that caused her to fear the defendant.  *Id.*  at 487.  The Sixth Circuit explained, however, that the improper testimony was duplicative of unchallenged testimony by the defendant's co-worker, who testified as to the defendant's interest in the victim, and the bulk of the testimony – that the victim had expressed fear of a man who fit the defendant's description – was appropriate under the state-of-mind exception.  *Id.* at 487-88.  In these circumstances, the court found, there was no due process violation.  *Id.*

Similarly, the admission of the victims' hearsay statements here did not have a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. at 623; *see Bains v. Cambra*, 204 F.3d 964, 977-78 (9th Cir. 2000) (erroneous admission of hearsay statements concerning murder victim's fear of defendant did not have substantial and injurious effect on verdict).  Because the Arizona Supreme Court reasonably applied clearly established federal law in rejecting this claim, Petitioner is not entitled to habeas relief.  *See Mitchell v. Esparza*, 540 U.S. 12 (2003) (stating that habeas relief is appropriate only if state court's application of harmless-error review was objectively unreasonable).

## III.   Application of (F)(3) Aggravating Factor

Petitioner alleges in Claim 9 that the "grave risk to others" aggravating factor was found in violation of the federal Constitution.[8]  Specifically, Petitioner contends that there were no facts elicited at trial to support a finding that anybody but the victims was put in grave risk by Petitioner's actions during the shootings.  (Dkts. 24 at 97-110, 69 at 20-22.)  According to Petitioner, the (F)(3) factor could only have been satisfied if he "had fired

---

[8]   Under A.R.S. § 13-703(F)(3), it is an aggravating factor if, "[i]n the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the person murdered in the commission of the offense."

randomly into the auto shop, while intending to kill only the Dietzes, or if he had fired at the

Dietzes from such a distance that it put other, unintended victims in the zone of danger." (*Id.*

at 21.)

On direct appeal, the Arizona Supreme Court rejected this argument:

We have never . . . limited this factor to cases in which another person was directly in the line of fire. For example, we have found a zone of danger where the defendant shot his intended victim while a third person was nearby and then pointed his gun at the third person before returning his attention to the victim. *State v. Nash,* 143 Ariz. 392, 405, 694 P.2d 222, 235, *cert. denied,* 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985). We noted there that in the absence of such a combination of factors – the third person's proximity during the actual shooting and the defendant's pointing his gun – the general rule is that mere presence of bystanders or pointing a gun at another to facilitate escape does not bring a murderous act within A.R.S. § 13-703(F)(3). *Id.* at 405, 684 P.2d at 235. No single factor is dispositive of this circumstance. Our inquiry is whether, during the course of the killing, the defendant knowingly engaged in conduct that created a real and substantial likelihood that a specific third person might suffer fatal injury.

*Wood*, 180 Ariz. at 69, 881 P.2d at 1174 (additional citations omitted). The court then

explained that "in this case, several factors *in combination* support the conclusion that

Defendant knowingly created a grave risk of death to others":

[A]t least three other employees were present in the confined garage where Defendant shot Eugene. One was standing only six to eight feet away from Eugene at the time of the shooting. After Defendant shot Eugene, he turned toward another employee as if "he was going to shoot but [that employee] . . . really got out of there fast." When Defendant pointed his gun at Eugene again, one employee fought with Defendant and even grabbed the gun's barrel. Moreover, a firearms expert testified that the position of the fired and unfired cartridges in the murder weapon showed that Defendant had cocked and uncocked the gun twice between shooting Eugene and Debra. Thus, there is evidence Defendant knowingly prepared the gun to fire both when he assumed a shooting stance toward one employee and when he grappled with the other. All this occurred during Defendant's commission of the two murders.

*Id.* at 69-70, 881 P.2d at 1174-75 (citations omitted). The court concluded that "under these

circumstances the judge's finding that Defendant created a grave risk of death to at least

these two employees is correct." *Id.* at 70, 881 P.2d at 1175.

<u>Analysis</u>

As noted above, a state court's errors in applying state law do not give rise to federal

- 30 -

habeas corpus relief. *See Estelle v. McGuire*, 502 U.S. at 71-72. On habeas review of a state court's finding of an aggravating factor, a federal court is limited to determining "whether the state court's [application of state law] was so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation." *Lewis v. Jeffers*, 497 U.S. at 780. In making that determination, the reviewing court must inquire "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found that the factor had been satisfied.'" *Id*. at 781 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Based upon the combination of circumstances discussed by the Arizona Supreme Court, a rational trier of fact could have found that Petitioner's "murderous act itself put other people in a zone of danger." *Wood*, 180 Ariz. at 69, 881 P.2d at 1174 (quoting *State v. McCall*, 139 Ariz. 147, 161, 677 P.2d 920, 934 (1983)). The trial testimony shows that in addition to shooting the victims at close range, Petitioner pointed his gun at one person and wrestled with Donald Dietz while Dietz tried to prevent Petitioner from shooting his brother Eugene a second time. (RT 2/20/91 at 166, 173, 181-84.) During these incidents, which occurred between the shooting of Mr. Dietz and the shooting of his daughter, Petitioner cocked and uncocked his gun twice. (RT 2/22/91 at 11-15.) Certainly a rational factfinder could determine, as the trial court and state supreme court did, that Petitioner's actions created a real and substantial likelihood that Donald Dietz could have been shot to death as he struggled with Petitioner. *See Miller v. Lockhart*, 65 F.3d 676, 687 (8th Cir. 1995) (great-risk-of-death-to-others aggravating circumstance was supported by evidence that the victim was shot with handgun in downtown business district during morning hours and the inference that the sound of handgun would attract others to scene).

The decision of the Arizona Supreme Court denying this claim is neither contrary to nor an unreasonable application of clearly established federal law. Therefore, Petitioner is not entitled to relief on Claim 9.

## IV.    Ineffective Assistance of Counsel at Trial

For IAC claims, the applicable law is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under *Strickland*, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. 466 U.S. at 687-88.

The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Thus, to satisfy *Strickland*'s first prong, deficient performance, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* For example, while trial counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary, . . . a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. To determine whether the investigation was reasonable, the court "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation marks omitted). As the Supreme Court recently reiterated: "In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made" and by applying deference to counsel's judgments. *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (quoting *Strickland*, 466 U.S. at 689).

Because an IAC claim must satisfy both prongs of *Strickland*, the reviewing court "need not determine whether counsel's performance was deficient before examining the

prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed").  A petitioner must affirmatively prove prejudice.  *Id.* at 693.  To demonstrate prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  The calculus involved in assessing prejudice "should proceed on the assumption that the decision-maker is reasonably, conscientiously, and impartially applying the standards that govern the decision."  *Id.* at 695.

"When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.  In answering that question, a reviewing court necessarily considers the strength of the state's case.  *See Allen v. Woodford,* 395 F.3d 979, 999 (9th Cir. 2005) ("even if counsel's conduct was arguably deficient, in light of the overwhelming evidence of guilt, [the petitioner] cannot establish prejudice"); *Johnson v. Baldwin*, 114 F.3d 835, 839-40 (9th Cir. 1997) (where state's case is weak, there is a greater likelihood that the outcome of the trial would have been different in the absence of deficient performance).

Also inherent in the prejudice analysis demanded by *Strickland* is the principle that in order to demonstrate that counsel failed to litigate an issue competently, a petitioner must prove that the issue was meritorious.  *See Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986).  For example, with respect to allegations that counsel was ineffective for failing to file a motion, to demonstrate prejudice a petitioner "must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him."  *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (citing *Morrison,* 477 U.S. at 373-74); *see also Boyde v. Brown*, 404 F.3d 1159, 1173-74 (9th Cir. 2005).

1    Therefore, in evaluating a number of the following IAC claims, this Court is informed by the

2    holding of the Arizona Supreme Court on the merits of the underlying issues.

3           Finally, under the AEDPA, federal review of state court decisions is subject to another

4    level of deference.  *Bell v. Cone*, 535 U.S. 685, 698-99 (2002).  In order to merit habeas

5    relief, therefore, Petitioner must make the additional showing that the state court's ruling that

6    counsel was not ineffective constituted an unreasonable application of *Strickland*.  28 U.S.C.

7    § 2254(d)(1).

8           **A.     Failure to Provide Materials to Dr. Allender**

9           Petitioner alleges in Claim 10-B that trial counsel rendered ineffective assistance by

10   failing to provide sufficient background materials to the defense neuropsychologist, Dr.

11   James Allender.  (Dkts. 24 at 111-23, 69 at 25-28.)

12          Background

13          In assessing this, and other claims challenging counsel's handling of evidence

14   concerning Petitioner's mental state, it is necessary to review the information available to and

15   generated by the mental health experts who examined Petitioner in preparation for the guilt-

16   stage of trial.

17          *Dr. Catherine Boyer*

18          In preparing her pre-Rule 11 competency examination, Dr. Catherine Boyer conducted

19   a clinical interview of Petitioner and reviewed police reports, Petitioner's statements while

20   hospitalized after the shootings, and the grand jury transcript.  (ROA-PCR 1212.)  During

21   the interview, Petitioner provided "considerable background information."  (ROA-PCR

22   1213.)  He detailed his own problems with alcohol and reported that his father was also an

23   alcoholic.  (*Id.*)  He stated that he experienced violent rages when he was drinking; he also

24   experienced rages when he was not drinking but was able to control himself in those

25   situations.  (*Id.*)  His drinking caused frequent blackouts.  (*Id.*)  Petitioner also reported a

26   history of drug use involving cocaine and methamphetamine.  (*Id.*)  He described two suicide

27

28                                         - 34 -

attempts in 1983. (ROA-PCR 1214.)  On the first occasion he was hospitalized after taking an overdose of pills.  (*Id.*)  The second attempt involved Petitioner locking himself in the bathroom and threatening to kill himself with a razor.  (*Id.*)  Finally, Petitioner recounted "approximately four episodes of unconsciousness subsequent to head injuries, some of them after motorcycle accidents or fights."  (*Id.*)  One of these periods of unconsciousness lasted approximately an hour; on one occasion he was hospitalized for observation.  (*Id.*)  According to Petitioner, "he did not notice any difficulties in functioning subsequent to these injuries" but other people told him that he had become "more moody, 'going from calm to upset.'"  (*Id.*)

Dr. Boyer concluded that Petitioner appeared to be competent to stand trial.  (ROA-PCR 1217.)  She also addressed the issue of possible "organic impairment " caused by head injuries and substance abuse.  (*Id.*)  Dr. Boyer opined that while "it would not be surprising for [Petitioner] to have some organic impairment," "he does not appear to have serious cognitive deficiencies and any impairment is likely to be mild."  (*Id.*)  Dr. Boyer further indicated that any change in Petitioner's emotional "lability" or ability to exercise self-control was likely the product of alcohol intoxication rather than a head injury.  (*Id.*)  According to Dr. Boyer:

> The best way to document the possible emotional effects of such a head injury would be to interview those who knew [Petitioner] both prior and subsequent to that injury and to obtain their observations about his behavior.  More in-depth neuropsychological and neurological assessment could be conducted, although even if they showed some deficiencies, it is unlikely that they would be sufficient to preclude his being aware of his own behavior. They might provide some information which could be mitigating, however.

(*Id.*)

*Dr. Larry Morris*

Dr. Larry Morris, who performed the first of the two Rule 11 evaluations, conducted a clinical diagnostic interview, administered the MMPI-2, and reviewed police reports, witness interviews, grand jury testimony, and the autopsy report.  (ROA-PCR 1220-21.)

- 35 -

Petitioner again recounted his family background, including his father's alcoholism. (ROA-PCR 1221-22.)  He described his own problems with alcohol abuse, explaining that when intoxicated he had difficulty controlling his anger. (ROA-PCR 1222-23.) Petitioner reported that he sought help, received treatment at the Veteran's Administration Hospital in Tucson, remained sober for two years, but relapsed when his father began drinking again.  (ROA-PCR 1223.) He also began using cocaine and "crank." (*Id.*) Petitioner informed Dr. Morris that he did not abuse drugs or alcohol in the hours prior to the shootings; he last used speed on the preceding Friday and had only two drinks on Sunday.  (ROA-PCR 1224.)

The results of the MMPI-2 indicated "severe psychopathology characterized by both cognitive and emotional disturbances."  (ROA-PCR 1225.)  According to Dr. Morris, individuals with Petitioner's anti-social profile experience mistrust, are unskilled socially, and have difficulty establishing interpersonal relationships.  (*Id.*)  They "tend to be argumentative, hostile and aggressive.  Angry acting-out is a strong possibility. . . . Impulsivity and poor judgment are cardinal features of this profile type." (*Id.*)  However, while Dr. Morris found that Petitioner was a "dysfunctional individual," he concluded that Petitioner was competent to stand trial. (*Id.*)

Subsequent conversations between Dr. Morris and defense counsel clarified Dr. Morris's opinion with respect to Petitioner's condition, specifically as to whether or not he had a character trait of impulsivity. (ROA-PCR 1042-45, 1056-59.)  In one conversation counsel sought Dr. Morris's opinion as to the import of the increasingly frantic phone messages Petitioner left with Debra Dietz prior to the shootings. (*Id.*)  Despite the existence of such evidence, Dr. Morris explained to counsel that he did not believe Petitioner qualified for a defense under the holding in *State v. Christensen*:[9]

---

[9]     In *Christensen*, the defendant sought to admit expert testimony regarding his tendency to act without reflection. 129 Ariz. 32, 628 P.2d 580 (1981).  The Arizona Supreme Court held that it was error to exclude such testimony because "establishment of the character trait of acting without reflection tends to establish that appellant acted impulsively.

He's an impulsive guy and he's kind of angry, but he certainly doesn't fit the *Christensen* definition for that. I mean I can testify that he's angry and impulsive, but if we're going to try and use *Christensen* and if you really get into the details of that, I'll have to say that I really don't think he fits *Christensen*, because I don't think that he does.

(*Id.* at 1074.) Counsel later pressed Dr. Morris: "Well, I don't want you to say or do anything you can't do in good conscious [sic], but you – are you saying you don't find elements of impulsive behavior in [Petitioner]?" (*Id.* at 1078.) Dr. Morris replied: "Not to the extent that I could testify with a, you know, a considerable amount of confidence that this is a Christenson [sic] kind of defense." (*Id.*)

Counsel decided not to call Dr. Morris as a witness. Instead, he determined that Dr. Allender would be able to offer more favorable testimony regarding Petitioner's character trait of impulsivity. (*Id.* at 1116.)

*Dr. Barry Morenz*

Dr. Barry Morenz conducted the second Rule 11 evaluation. He interviewed Petitioner and reviewed the reports of Drs. Boyer and Morris, police reports, grand jury testimony, and autopsy reports. (ROA-PCR 1228.) Dr. Morenz's report recounted Petitioner's background, including his problems with alcohol and drugs, his suicide attempts, and his head injuries. (ROA-PCR 1229-30.) With respect to the latter, Dr. Morenz indicated that Petitioner "suffered several episodes of head injury with loss of consciousness, the longest lasting approximately for an hour. [Petitioner] states that other people told him that he had been somewhat more moody since this last head injury in 1981. He claims no awareness of this." (ROA-PCR 1231.) Dr. Morenz diagnosed Petitioner with alcohol abuse and found that he was competent to stand trial. (*Id.*)

*Dr. James Allender*

In the report he prepared for trial, Dr. James Allender indicated that he had reviewed

---

From such a fact, the jury could have concluded that he did not premeditate the homicide." *Id.* at 35, 628 P.2d at 583.

the psychological evaluations performed by Drs. Morris, Boyer, and Morenz; police reports and interviews with officers; and interviews with Petitioner and Petitioner's father. (ROA-PCR 1089.) Dr. Allender also performed a battery of tests and a clinical interview of Petitioner. (*Id.*) According to Dr. Allender, Petitioner "reported that he had suffered three motorcycle accidents in which he might have sustained a head injury." (ROA-PCR 1090.) Dr. Allender's report also detailed Petitioner's history of drug and alcohol abuse. (*Id.*) While stating that "[n]europsychological evaluation was requested given [Petitioner's] history of potentially significant head injuries and his reported memory deficit," Dr. Allender concluded that Petitioner's "report of no significant change in his thinking and the lack of significant findings on neuropsychological assessment suggest little evidence for cognitive impairment due to his motorcycle accidents." (ROA-PCR 1092.) Dr. Allender did opine that Petitioner possibly suffers from a verbal learning disability. (*Id.*) He also concluded that Petitioner's "reality testing deteriorates in emotionally charged situations" and that on such occasions he "would act in an angry and impulsive way." (*Id.*)

*PCR Proceedings*

Petitioner presented this IAC claim to the PCR court. In support he submitted affidavits from Dr. Allender dated April 22 and June 21, 1996. (ROA-PCR 1042-45, 1056-59.) In these affidavits, Dr. Allender listed the information provided to him by defense counsel, complained that counsel did not adequately explain the legal concepts of impulsivity and diminished capacity, and asserted that counsel's failure to prepare him adequately prevented him from asking counsel for additional information. (*Id.*) Dr. Allender then opined that the additional information he reviewed since the trial – indicating that Petitioner may have been experiencing drug withdrawal, that his mental state was rapidly deteriorating as evidenced by phone messages he left Debra Dietz in the days prior to the shootings, and that he was victimized by Ms. Dietz's manipulative and deceptive behavior – all would have supported a finding that Petitioner acted impulsively at the time of the killings. (*Id.*)

In rejecting Petitioner's claim that counsel's failure to provide background materials to Dr. Allender was constitutionally ineffective, the PCR court determined that Petitioner had not established that he was prejudiced by counsel's performance.  It stated:

> In view of the testimony of numerous witnesses, including Dr. Allender, addressing the issue of Petitioner's impulsivity, the Court finds that Petitioner has not shown how the provision of the then existing medical and military records to expert witnesses would have affected the outcome of the trial.

(ME 6/6/97 at 5.)

Analysis

Petitioner asserts that counsel failed to provide sufficient background regarding Petitioner to Dr. Allender.  However, the record refutes this allegation.  Petitioner himself provided information to Dr. Allender regarding his history of alcohol abuse.  (RT 2/22/91 at 150.)  At trial, Dr. Allender testified that Petitioner:

> told me that for approximately ten years since around 1980 he had difficulty with alcohol abuse.  Okay.  He represented that in 1980 he was drinking to the level that he was suffering from blackouts.  That is enough drinking to where you no longer can remember the next morning what you did.
>
> He also reported that this led him to getting into fights and trouble for insubordination.
>
> He told me in 1984 he came back to the States, he had been in the military prior and he went through an in-patient treatment program for alcohol abuse and that he was sober for approximately two and a half years but then by around 1986 or '87 he began using cocaine, speed and crank and that up until the time, the last year or so he was drinking every other night, quite a bit, maybe up to ten drinks a night.  And also using methamphetamine which was his drug of choice.

(RT 2/22/91 at 150.)

Dr. Allender further testified that, in evaluating Petitioner, he reviewed the reports of other doctors.  (*Id*. at 145–46.)  Each of these reports discussed Petitioner's personal and family history of alcohol abuse.  (*See* ROA-PCR at 1213-14, 1221-23, 1230-31.)

Petitioner likewise provided information about his head injuries to Dr. Allender.  (RT 2/22/91 at 149.)  Dr. Allender testified that Petitioner reported "three different head injuries that he had.  Each time it was related to a motorcycle accident, each time as I recall he was

- 39 -

wearing a helmet." (*Id.*)  Trial counsel likewise provided information to Dr. Allender about Petitioner's head injuries.  (*Id.* at 145.)  Dr. Allender testified that counsel "had mentioned these things to me" when he stated that Petitioner "had a history of head injuries and he had some reported difficulties in recalling."  (*Id.*)

Furthermore, Petitioner cannot show prejudice because counsel did in fact present an impulsivity "defense," and Petitioner has not demonstrated a reasonable probability that a different or more comprehensive presentation of that defense would have resulted in a different verdict, particularly in the face of the strong evidence of premeditation.[10]  *See Williams v. Calderon*, 52 F.3d 1465, 1470 (9th Cir. 1995) ("any error of counsel for capital murder defendant in failing to conduct further investigation of possible diminished capacity defense did not prejudice defendant given that defense proceeded on theory of diminished capacity and contrary evidence of defendant's intent to kill and ability to reflect those actions was overwhelming").

Petitioner's theory at trial was that he acted reflexively and without premeditation – consistent with his character trait of impulsivity – when he shot Eugene and Debra Dietz. Dr. Allender's testimony, which included a discussion of Petitioner's medical history, focused on Petitioner's trait for impulsivity.  (RT 2/22/91 at 142-90.)  Complementing Dr. Allender's testimony concerning Petitioner's impulsivity was the testimony of several lay witnesses, including Petitioner's friends and family.  Jennifer Schaffer, a former girlfriend of Petitioner, testified that his mood would change when he had been drinking; he would

---

[10]     As Respondents note, and as trial counsel was aware, a defense of diminished capacity was not available under Arizona law.  *See State v. Mott*, 187 Ariz. 536, 541, 931 P.2d 1046, 1051 (1997) (Arizona does not allow expert testimony regarding a defendant's mental disorder short of insanity as an affirmative defense or to negate the *mens rea* element of a crime); *see also Clark v. Arizona*, 126 S. Ct. 2709 (2006) (upholding the rule established in *Mott*).  Thus, counsel was prohibited from presenting evidence of mental disease or defect to show that Petitioner was incapable of premeditating the killings.  *Mott*, 187 Ariz. at 540, 931 P.2d at 1050

- 40 -

become depressed and angry.  (*Id.* at 27.)  She further testified that Petitioner would become paranoid and "hyper" when he was on crank and cocaine, drugs that she observed him using during the period before the shootings.  (*Id.* at 30-33.)  Mona Donovan testified that Petitioner was unpredictable and impulsive, even when he was not drinking, and that it was impossible to predict how he would react to situations.  (*Id.* at 87-88.)  Cheryl Whitmer, another girlfriend, described her observations of Petitioner's emotional state on the night before the shooting.  According to Ms. Whitmer, Petitioner did not appear to be himself; he was upset and worried.  (*Id.* at 117.)  He complained of a headache, and she gave him some prescription pain pills.  (*Id.* at 117-20.)  Later that night she saw him again; he was sweating and crying, upset about not seeing Debra Dietz.  (*Id.* at 119-23.)  She also recounted an incident when Petitioner yelled obscenities and broke Ms. Dietz's belongings when she failed to meet him at the apartment.  (*Id.* at 136-38.)

Petitioner's parents outlined his family background and emotional development, including his military service, his father's alcoholism, his own problems with alcohol abuse, and his volatile relationship with Ms. Dietz.  (*Id.* at 56-60, 66.)  Their testimony also described incidents of reflexive, irrational behavior.  To detail Petitioner's impulsivity and anger-control problems, Petitioner's mother described an incident in which Petitioner suddenly became upset and went from the kitchen to the living room and swept everything off the buffet; immediately after the incident he was okay again.  (*Id.* at 59-69.)  Petitioner's father testified that Petitioner "was an ideal child" but that he began to act impulsively and irrationally after leaving the military.  (*Id.* at 70-71, 71-74, 80-81.)  He also recounted incidents when Petitioner was "[i]rrational and . . . too quick to respond to situations without any forethought."  (*Id.* at 72.)  On one occasion Petitioner chased down a boy who had fired an air rifle at his house.  (*Id.*)  On another occasion he locked himself in the bathroom, where he broke the mirror and pulled the toilet loose from the floor.  (*Id.* at 73.)  In a third incident he was "totally out of control" and pushed his father.  (*Id.*)  Petitioner's father proceeded to

describe additional incidents when Petitioner was "irrational and uncontrollable." (*Id.* at 80.)

Given the substantial evidence presented by counsel supporting Petitioner's defense of impulsivity, Petitioner cannot demonstrate either deficient performance or prejudice. The PCR did not unreasonably apply *Strickland* when it rejected this claim.

## B.    Failure to Object to Prosecutorial Misconduct

Petitioner alleges in Claim 10-C(1) that trial counsel rendered ineffective assistance by failing to object to the instances of alleged prosecutorial misconduct outlined in Claim 1. Specifically, Petitioner contends that counsel should have objected when the prosecutor asked Dr. Allender whether he had hypnotized or administered "truth serum" to Petitioner; elicited bad character evidence; examined Dr. Allender regarding Petitioner's mental state at the time of the crime; elicited testimony regarding Petitioner's state of mind at the time of the crime; and elicited irrelevant and inflammatory comments from the victims' family members.

Respondents counter that counsel's failure to object to such testimony was consistent with "a trial strategy in which [Petitioner's] murders of Eugene and Debra were characterized as the result of his impulsive behavior rather than with premeditation." (Dkt. 74 at 29.) Respondents also contend that because there was no prosecutorial misconduct, objections would have been futile. (*Id.*)

The PCR court correctly denied these claims, finding that Petitioner had failed to show prejudice. (ME 6/6/97 at 4, 7.) As an initial matter, the Arizona Supreme Court determined that, with the exceptions noted above, the testimony elicited through the prosecutor's "misconduct" was admissible. *Wood*, 180 Ariz. at 62-65, 881 P.2d at 1167-70. Therefore, counsel's failure to object cannot be criticized as deficient performance because such objections would have been overruled. *See Boyde v. Brown*, 404 F.3d at 1173-74 (counsel is not required to take a futile action). With respect to those instances where the testimony was objectionable, Petitioner was not prejudiced because the testimony was not

inconsistent with his defense theory and because the jury's finding of premeditation was supported by strong evidence.

Moreover, Petitioner has not demonstrated that counsel's performance was deficient. The only issue at the guilt-stage of trial was Petitioner's state of mind at the time of the murders. The testimony elicited by the prosecutor did not prejudice Petitioner with respect to his defense of impulsivity. Indeed, as Respondents contend, evidence elicited by the prosecutor concerning instances of erratic behavior was consistent with the strategy of offering Petitioner's impulsive personality and bad temper as a defense to the element of premeditation. The conclusion that counsel's decision not to object was part of an overall strategy is supported by counsel's presentation in the defense case of similar evidence of Petitioner's impulsive personality and inability to control his anger. *See Wood*, 180 Ariz. at 65, 881 P.2d at 1170.

Even if the information elicited by the prosecutor had been more damaging to the defense case, "[d]ecisions not to object to *inadmissible evidence* already heard by the jury can in many cases be classified as part of a deliberate strategy to avoid calling the jury's attention to that evidence." *Hodge v. Hurley*, 426 F.3d at 385-86; *see United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991). Such considerations may have motivated counsel not to object to emotional testimony from the victims' family members.[11] *See, e.g.*, *Nance v. Norris*, 392 F.3d 284, 293 (8th Cir. 2004) (no IAC where counsel failed to object to witness's inadmissible call for imposition of death penalty because a "reasonable lawyer may wish to refrain from objecting to this type of statement when uttered by the victim's grieving mother, in front of a jury").

---

[11]  Moreover, some of this testimony was not objectionable. For example, Donald Deitz's description of Petitioner's demeanor during the shootings (RT 2/20/91 at 181-84) was clearly relevant to the issue of premeditation. In addition, any prejudicial impact from the family members' testimony was lessened when the trial court instructed the jury not to be influenced by sympathy or prejudice. (RT 2/25/91 at 34.)

- 43 -

1    *Strickland* requires this Court to presume that counsel's strategy was reasonable. 466

2    U.S. at 688-89. Given this presumption, which is supported by the incontrovertible evidence

3    that Petitioner killed the two victims, leaving only the element of premeditation in question,

4    the fact that counsel's defense strategy was not ultimately successful is not sufficient for a

5    finding of ineffective assistance. As the *Strickland* Court explained: "It is all too tempting

6    for a defendant to second-guess counsel's assistance after a conviction or adverse sentence,

7    and it is all too easy for a court, examining counsel's defense after it has proved

8    unsuccessful, to conclude that a particular act or omission was unreasonable." *Id.* at 689; *see,*

9    *e.g.*, *United States v. Mejia-Mesa,* 153 F.3d 925, 931 (9th Cir. 1998) ("While [a defendant]

10   may argue that it may have been better to make a certain objection, a few missed objections

11   alone, unless on a crucial point, do not rebut the strong presumption that counsel's actions

12   (or failures to act) were pursuant to his litigation strategy and within the wide range of

13   reasonable performance."); *Seehan v. Iowa*, 72 F.3d 607, 610-12 (8th Cir. 1995).

14          Finally, in assessing the reasonableness of the PCR court's rejection of this claim, the

15   Court again notes that the Arizona Supreme Court held that the admission of improper

16   evidence did not deprive Petitioner of a fair trial. *Wood*, 180 at 61-65, 881 P.2d at 1166-70.

17   The Arizona Supreme Court reached this conclusion based upon its determination that the

18   evidence of premeditation was particularly strong. *Id.* at 64, 881 P.2d at 1169; *see Jackson*

19   *v. Calderon*, 211 F.3d at 1161 (even when cumulated, any failures of trial counsel did not

20   create a reasonable probability that, but for the cumulative effect of the errors, the result

21   would have been different, given persuasive case of deliberation and premeditation despite

22   the defendant's PCP intoxication); *Bland v. Sirmons*, 459 F.3d 999, 1032-33 (10th Cir. 2006)

23   (state court did not act contrary to or unreasonably apply federal law in determining that

24   petitioner was not prejudiced by counsel's failure to object to prosecutor's improper

25   characterization of jury instructions and calling petitioner an "evil man" and a "heartless and

26   vicious killer" on basis that timely objections would not have affected outcome of trial.).

27

28

1    For the reasons set forth above, Petitioner is not entitled to relief on this claim.

2    **IV.   Ineffective Assistance of Counsel at Sentencing**

3    Petitioner contends that counsel did not adequately investigate and present various

4    categories of mitigation information related to Petitioner's social and medical background

5    and failed to prepare Petitioner for his presentence interview.  (Dkts. 24 at 136-48, 69 at 28-

6    31.)  He also contends that he was prejudiced by the cumulative impact of counsel's deficient

7    sentencing-stage performance.  (*Id.*)

8    The right to effective assistance of counsel applies not just to the guilt phase, but

9    "with equal force at the penalty phase of a bifurcated capital trial."  *Silva v. Woodford*, 279

10   F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir.

11   1995)).  With respect to prejudice at sentencing, the *Strickland* Court explained that "[w]hen

12   a defendant challenges a death sentence . . . the question is whether there is a reasonable

13   probability that, absent the errors, the sentencer . . . would have concluded that the balance

14   of aggravating and mitigating circumstances did not warrant death."  466 U.S. at 695.  In

15   *Wiggins*, the Court further noted that "[i]n assessing prejudice, we reweigh the evidence in

16   aggravation against the totality of available mitigating evidence."  539 U.S. at 534.  The

17   "totality of the available evidence" includes "both that adduced at trial, and the evidence

18   adduced in the habeas proceeding."  *Id.* at 536 (quoting *Williams v. Taylor*, 529 U.S. at 397-

19   98).

20   The clearly-established federal law governing this claim includes the Supreme Court's

21   decision in *Bell v. Cone*, 535 U.S. 685, which clarifies the standard this Court must apply in

22   reviewing the PCR court's rejection of Petitioner's sentencing-stage IAC claim.  After noting

23   the deferential standards set forth in the AEDPA and required by its own precedent, the

24   Supreme Court explained that for a habeas petitioner's IAC claim to succeed:

25
he must do more than show that he would have satisfied *Strickland*'s test if his
26   claim were being analyzed in the first instance, because under § 2254(d)(1),
it is not enough to convince a federal habeas court that, in its independent
27   judgment, the state-court decision applied *Strickland* incorrectly.  Rather, he

28

must show that [the state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner.

*Id.* at 698-99 (citation omitted).

In evaluating Petitioner's claim of sentencing-stage IAC, this Court will follow *Strickland*'s instruction that "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."  466 U.S. at 697.

### A.  Failure to Present Mitigation Evidence

Petitioner alleges in Claim 10-C(3)(a) that counsel's performance at sentencing was constitutionally ineffective because counsel failed to adequately prepare and present evidence of Petitioner's diminished capacity, including personality changes following several serious head injuries; his social background, including a family history of alcoholism and mental illness; and his military service.  Petitioner also alleges that counsel was ineffective in failing to obtain and present an in-depth neurological evaluation to connect Petitioner's mental deficits to the crime.  (Dkts. 24 at 136-43, 69 at 28.)   Respondents contend that Petitioner was not prejudiced because counsel did in fact present the trial court with information about his family background, medical history, substance abuse problems, and military service, and because he attempted to secure neurological testing.  (Dkt. 74 at 46-55.)  As set forth below, the Court agrees that Petitioner was not prejudiced by these aspects of counsel's performance and therefore is not entitled to habeas relief.

Background

Defense counsel filed an eighteen-page sentencing memorandum.  (ROA 482-99.)  The memorandum challenged the aggravating factors advanced by the State and set forth the mitigation argument that the crime was a product of Petitioner's mentally impaired state – an impairment caused by Petitioner's chemical abuse and addiction, the presence of alcoholism in his family background, and his dysfunctional relationship with Debra Dietz.  (*Id.*)

Counsel attached a number of documents to the memorandum.  The first was the transcription of counsel's interview of Petitioner's father. (ROA 501-16.)  In that interview Mr. Wood detailed his own alcoholism, the effects of which Petitioner was exposed to while growing up, and Petitioner's problems with alcohol. (*Id.*)  Counsel asked if there was any history of mental illness in the family; Mr. Wood replied that there was not. (*Id.*)  Mr. Wood also explained that Petitioner's drinking and behavior had gotten out of control. (*Id.*)  Counsel asked if Petitioner had experienced any head injuries as a child; Mr. Wood explained that Petitioner had been knocked unconscious at age two or three afer running into a wall, and that he had been involved in motorcycle accidents. (*Id.*)  The next attachment consisted of Petitioner's military records, which included medical reports and the records from his treatment for alcoholism at the Tucson V.A. hospital. (ROA 517-763.)  Finally, counsel attached the transcript of his pretrial interview with Mona Donovan, who described positive aspects of Petitioner's character despite the chaotic nature of his relationship with Debra Dietz. (ROA 764-87.)  Contained in these voluminous documents was information concerning all of the areas of mitigation Petitioner now contends were ignored at sentencing.[12]

Prior to sentencing, counsel moved for the appointment of Dr. Michael Breslow, a "psychiatric chemical dependency expert." (ROA 463-66.)  The court granted the motion. (ME 6/13/91.)  Counsel also sought the appointment of a "neurometric brainmapping technician" "for the purpose of diagnosing the absence or presence of organic brain damage and/or psychopathology." (ROA 471.)  The request was based upon Dr. Breslow's suggestion that Petitioner's involvement in three motorcycle accidents supported the "possibility" of "organic brain disease." (*Id.* at 478.)  The trial court denied the motion,

---

[12]     Prior to sentencing, counsel also obtained Petitioner's school records. (Dkt. 25, Ex. 9.) These records, which counsel did not present to the court, indicate that Petitioner was a mediocre student who had difficulties with English. (*Id.*) Petitioner graduated from high school in 1977 ranked 316 out of 428 students. (*Id.*)

finding that "there appear[ed] to be no support for this type of examination." (ME 6/24/91.)

In addition to these motions seeking the appointment of experts at sentencing, counsel moved to replace the probation officer assigned to prepare the presentence report (ROA 458-62) and to suppress the report (ROA 794-97) on the grounds that the probation officer was hostile to Petitioner and her report was biased. The court denied both motions. (ME 6/13/91.)

Dr. Breslow interviewed Petitioner twice. (RT 7/12/91 at 8.) He also reviewed a variety of background information, including Petitioner's medical and military records; statements from trial witnesses; and the mental-health evaluations prepared by Drs. Morris, Morenz, and Allender. (*Id.* at 8-9.)

At the presentencing hearing, counsel presented Dr. Breslow's testimony. Dr. Breslow testified that he diagnosed Petitioner with a "narcissistic personality feature which means that he tends to be very sensitive to any slight criticisms or rejections and tends to respond with anger inappropriately in those situations." (*Id.* at 10.)

Dr. Breslow then testified that Petitioner "suffers from alcohol dependency and stimulant dependent. And also amphetamines and cocaine dependent." (*Id.*) He explained that "[b]oth of these have been going on for many years. Probably since his early twenties with the alcohol dependency. Approximately five to six years on the stimulant dependency." (*Id.*) Dr. Breslow described alcoholism as a disease with a "chronic persistent deteriorating course." (*Id.*) He also testified with respect to the "genetic component" of alcoholism:

Q:    Do you find that there was any [family history] in his case with alcohol?

A:    Yes. His father and his father's father suffered from alcoholism.

Q:    Did you learn anything about his family life with his father and mother in connection with this alcoholism?

A:    Yes. There was marked influence of alcohol in his family while he was growing up. And as a result affected both of his parents on an emotional as well as a lot of other aspects and there was a lot of hostility, a lot of hostile fights, a lot of unpredictability in the home

- 48 -

1    involving the parents drinking.

2    (*Id.* at 11.)

3    Dr. Breslow then explained that the lack of consistent parental role models contributed

4    to Petitioner's difficulty in expressing and controlling his anger. (*Id.* at 11-12.)  The fact that

5    Petitioner's family moved frequently also prevented him from forming connections with

6    other adults who could have served as role models. (*Id.*)

7    Counsel next questioned Dr. Breslow about the way in which Petitioner's personality

8    was affected by his problems with substance abuse:

9    Q:    What effects to [sic] [Petitioner's] addiction to alcohol and his chemical
10         dependency have in terms of anger control?

11   A.    It has a profound effect.  Although [Petitioner] usually would become
           angry to what he sees as something a lot more intentional than you
12         would and because of his prior involvement with drugs and alcohol he
           is unable to control the behavior.  And I looked back over his military
13         records and the personal [sic] reports from the people who knew him
           and almost exclusively at the time when he was violent were times
14         when he was intoxicated.

15   Q:    What effect would it have upon his judgment?

16   A:    Well, it would certainly have impaired his judgment and made him
           more impulsive.

17
     Q:    Would you explain impulsivity?
18
     A:    Impulsivity would mean that a person would act without prior fault.
19         That is he had a feeling and/or idea that he would act on it whether
           that was the truth or not without reflecting on this and maybe thinking
20         about the alternatives or consequences might be.

21   Q:    So, impulsivity or an impulsive person acts reflectiveness [sic] and
           without reflection in other words.
22
     A:    Correct.
23

24   (*Id.* at 13-14.)

25   Counsel proceeded to question Dr. Breslow about Petitioner's lack of memory and his

26   mental condition at the time of the shootings.  Dr. Breslow indicated that one explanation

27   was that "organic brain syndrome and contusion resulting from an intoxicant substance in

28
                                      - 49 -

the brain, affecting the brain cells." (*Id.* at 15.)  He also opined that Petitioner could have "been under the influence of drugs or the consequences of drug usage" at the time and detailed other factors affecting Petitioner's condition:

> Well, he certainly hadn't had a full nights sleep.  And I think probably more significant than that was the fact that he had been using drugs on a daily basis on at least an eight month period prior to the shooting and for sure if he missed a day or two he would be in profound withdrawal and you would expect to see some simulance [sic] of symptoms of depression, irritability, and restlessness and some of those symptoms were described by witnesses the night prior to the shooting.

(*Id.* at 17-18.)  Dr. Breslow then recounted the trial testimony concerning Petitioner's deteriorating emotional condition and reiterated that Petitioner's behavior prior to the shootings was consistent with the symptoms of drug withdrawal and that withdrawal "would effect [sic] his mood and concentration and judgment." (*Id.* at 19.)

Counsel asked Dr. Breslow for his "professional opinion about whether [Petitioner's] chemical dependency and alcohol – well, let's just call it substance dependency – substantially impair his ability to conform to the norm of lawful behavior?" (*Id.* at 19-20.) Dr. Breslow answered:

> Well, throughout his life he demonstrated transgression of the law to normal accepted behavior intoxicated and otherwise this strange impulsivity and similar behavior when he was not using drugs and alcohol in addition as a result of his chronic alcohol and drug use I would expect that he does have limited ways of dealing with intense feelings, in particular anger, and as a consequence of his own views as well as that which occurred in his family he never learned and he had a retarded ability to learn at a later age, those same coping skills.

(*Id.* at 20.) Dr. Breslow further testified that Petitioner's "illness" had a "significant impact on his behavior at the time of these killings" because "[t]here is no way that amount of drugs and alcohol usage in a persons [sic] childhood as well as using as an adult could not influence their behavior and judgment in all areas." (*Id.*)

Finally, Dr. Breslow explained how Petitioner's narcissistic personality trait interacted with other factors to affect his conduct at the time of the shootings:

> For a person who is narcissistic, has narcissistic tendencies, even the slightest

- 50 -

rejection can be quite emotional and traumatic.

For instance, an individual being a few minutes late to an agreed upon greeting [sic] can be taken as quite a rejection or an individual not making contact on an agreed point in time would be taken as a severe rejection and could result in much more intense feelings of anger and a sadness, much more than you would expect to see in other individuals.

And, in addition, his relationship with Debbie Dietz was one that revolved at times around alcohol and drug usage and the relationship itself was unstable and it was – there is an unclear – there was an unclear communication and inconsistencies and this cycle, this pattern, and this violence, and this breaking up and getting back together, and this unclear relationship and these ill defined expectations.

(*Id.* at 21.)

Counsel's examination of Dr. Breslow concluded with the following colloquy:

Q:      At the time of the shooting do you believe that there had been some form of objection [sic] that had been troubling [Petitioner]?

A:      Yes.  By his report he was expecting to see Debbie Dietz Saturday or Sunday sometime during the week and apparently an agreed upon meeting place and that did not occur and he received no communication from her and for a person who is very sensitive to rejection such as [Petitioner] this would be taken as quite a blow and result in substantial feelings of anger and sadness.

Q:      And of course you can't – he couldn't handle this very well?

A:      I would have the opinion that he could not handle the anger very good because he is very limited – his judgment is very impaired because of his past drug and alcohol use.

(*Id.* at 21-22.)

Following Dr. Breslow's testimony, which was not subject to cross-examination, counsel argued that Petitioner's history of alcohol abuse should be considered in mitigation:

And I think that because we have established his long-term illness, his chronic progressive alcoholism and drug dependency and consequently the effect on his ability to function in a rational manner as a rational person.  The fact that it has given him anger and impulse control problems and that he cannot handle the stress and anger like ordinary rational people do that the Court can conclude that in the event, or that the events in this case were cause [sic] substantially by his illness and the problems that the illness imposed upon him in terms of being able to behave according to the norms of the law.

I believe that this mitigating factor is sufficient for the Court to conclude in this case that the death penalty is inappropriate.

- 51 -

(*Id.* at 28.)

Following the presentencing hearing, counsel filed a proposed special verdict form arguing, inter alia, that Petitioner's chemical dependency difficulties established a mitigating circumstance under A.R.S. § 13-703(G)(1).[13]  (ROA 789-93.)

In sentencing Petitioner, the court found that Petitioner had proved in mitigation a lack of prior felony convictions and "any other mitigating circumstances set forth in the presentence report, including testimony by the psychiatrist in mitigation of the sentence, including the chemical and alcohol abuse problems the defendant has suffered from." (ROA 816.) The court concluded, however, that the mitigating circumstances were not sufficiently substantial to call for leniency.  (*Id.*)

Analysis

A review of the specific areas of information cited by Petitioner as being omitted at sentencing reveals that in fact information regarding each issue was put before the trial court.

*Head injuries & brain mapping*

Petitioner raises two allegations.  First, that counsel failed to present evidence of Petitioner's reported head injuries and their effect on his personality, and, second, that counsel erred in failing to secure neurological testing or "brain mapping."   As the background recounted above demonstrates, neither of these allegations is meritorious.

The trial court was presented with evidence of Petitioner's reported head injuries through Dr. Allender's testimony during the guilt stage of trial. Dr. Allender testified that Petitioner's head injuries did not cause "a significant behavior change." (RT 2/22/91 at 151.) Petitioner's history of head injuries was also discussed in the reports of the other mental health experts. (ROA-PCR 1214, 1231.)  Counsel was not ineffective for failing to present

---

[13]     A.R.S. § 13-703(G)(1) provides that a mitigating circumstance exists if "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution."

evidence and argument at sentencing about Petitioner's head injuries because it had already been presented.  *See Bell v. Cone*, 535 U.S. at 699 (counsel not ineffective for failing to present at sentencing evidence already presented at trial).  Moreover, at the time of sentencing, counsel had at best equivocal information that Petitioner's head injuries caused the kind of damage that would have affected his behavior at the time of the killings.  Dr. Boyer, for instance, had opined that Petitioner's substance abuse was the likely cause of any changes in his personality (ROA-PCR 1217), and, as just noted, Dr. Allender reported that Petitioner did not experience any significant behavioral change (RT 2/22/91 at 151).  The Court also notes that there is no documentary support, in the form of medical records, for Petitioner's reported head injuries, all but one of which were purportedly caused by motorcycle accidents.  A reference in his military records to a 1981 accident indicates only that Petitioner suffered injuries to his ribs, shoulder, and thumb.  (ROA 599, 708.)

With respect to neurological testing, the PCR court found "that Mr. Couser did submit materials supporting his request for brain mapping.  There being no factual support for this claim of ineffective assistance of counsel, the Court finds that Mr. Couser's performance in this regard was within the range of professionally competent assistance." (ME 6/6/97 at 8.) The PCR court was correct – this IAC claim is not supported by the facts.  Counsel's performance cannot be deemed ineffective when he undertook the action Petitioner faults him for not taking.

Attached to Petitioner's amended habeas petition is an affidavit by Mark Walter, a clinical psychologist.  (Dkt. 25, Ex. 7.)  Dr. Walter attests that Petitioner's history of head injuries and substance abuse indicates that he suffers from "probable organic brain damage" and that this condition, along with his substance abuse problems and narcissistic and paranoid personality features, supports a "psychological profile for impulsive actions"; according to Dr. Walter, this profile could have been presented more "forcefully" at trial. (*Id.* at 3.)  Dr. Walter further attests that Petitioner's deteriorating psychological condition

- 53 -

was evident in the phone messages he left with the victim and was supported by Ms. Whitmer's trial testimony.  (*Id.* at 4.)  Finally, Dr. Walter states that "brain-mapping would provide tangible scientifically measurable evidence of frontal lobe dysfunctions which are associated with impulsivity problems and a lack of deliberative thinking."  (*Id.* at 4.)

This affidavit is not helpful to Petitioner.  First, the information it contains was, with the exception of the evidence of brain damage, presented at trial.  Second, with respect to the issue of brain damage, as the PCR court noted in denying this aspect of the IAC claim, counsel filed a motion seeking authorization for brain mapping (ROA 471-78), but the trial court denied it as unsupported (ME 6/24/91).

*Alcoholism*

As previously discussed, the focus of the evidence and argument presented by counsel at sentencing was Petitioner's history of alcoholism and substance abuse, including its genetic component, its impact on his personality and behavior, and the effects of withdrawal.  Counsel submitted Petitioner's treatment records and the affidavit of Petitioner's father and presented Dr. Breslow's testimony at the presentencing hearing.   The issue of Petitioner's alcohol and substance abuse problems, together with his father's history of alcoholism, was addressed at trial and in the reports of all the mental health experts.

 The PCR court considered and rejected this claim when it explained that Petitioner failed to establish that counsel's performance at the presentencing hearing resulted in prejudice:

> Without deciding whether [trial counsel's] failure to argue the suggested mitigating factors falls below the level of professionally competent assistance in a capital case, the Court adopts that portion of the State's Response [to the PCR petition] at page 69 line 7 through page 73 line 13 in support of its finding that [Petitioner] has failed to show a reasonable probability that, had [trial counsel] advanced each of these factually unsupported or legally irrelevant arguments, none of these arguments was reasonably likely to have meaningfully affected the outcome of sentencing.  No prejudice having been shown, the claim is denied.

(ME 6/6/97 at 9.)

- 54 -

The cited portions of the State's response assert that counsel was not ineffective with respect to presenting evidence, inter alia, of Petitioner's drug and alcohol use, including evidence that he was intoxicated or experiencing withdrawal at the time of the shootings. The State noted that Dr. Breslow testified that Petitioner may have been suffering from withdrawal, and that Petitioner himself had stated that he was not intoxicated during the killings.

Because counsel developed and presented this mitigating circumstance in detail, the PCR court was not unreasonable in rejecting this claim. This aspect of counsel's performance does not entitle Petitioner to habeas relief.

*Military service*

At the guilt stage of trial, Dr. Allender and Petitioner's parents testified concerning Petitioner's military service. (RT 2/22/91 at 56, 71, 150.) The sentencing memorandum submitted by counsel included Petitioner's military records, which incorporated various positive performance evaluations. (*See, e.g.*, ROA 625-33.) At the sentencing hearing, Dr. Breslow disclosed that he had read Petitioner's records from the Air Force, which again put the trial court on notice of Petitioner's military service. (RT 7/12/91 at 9.) The presentence report likewise indicated that Petitioner was in the United States Air Force from July 1977 until March 1983. (*See* ROA-PCR 1281; *see also* RT 7/12/91 at 32.) Petitioner cannot demonstrate that he suffered prejudice as a result of counsel's failure to argue that his military service was a mitigating factor because the trial court was well aware of that aspect of Petitioner's background.

*Application of clearly-established federal law*

In support of this claim, Petitioner relies on three recent decisions in which the Supreme Court reviewed claims of IAC at sentencing under the provisions of the AEDPA and held that the petitioners were entitled to relief: *Rompilla v. Beard*, 545 U.S. 374 (2005), *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Williams v. Taylor*, 529 U.S. 362 (2000). These

- 55 -

cases are readily distinguished from Petitioner's by the quality of the mitigating evidence that counsel failed to present at sentencing.

In *Rompilla*, for example, counsel failed to examine the file on the defendant's prior conviction, despite the fact that the prosecution announced that it was going to use the prior offense as an aggravating factor. 545 U.S. at 383. Had counsel examined the file, they would have discovered a wealth of mitigating information about Rompilla's childhood and mental health that was "very different[] from anything defense counsel had seen or heard" and that "would have destroyed the benign conception of Rompilla's upbringing and mental capacity defense counsel had formed from talking with Rompilla and his family members, and from the reports of the mental health experts." *Id.* at 390-91. According to the undiscovered information, Rompilla's parents were severe alcoholics; his mother drank during her pregnancy with Rompilla. *Id.* at 391-92. His parents fought violently, with his mother stabbing his father on one occasion. *Id.* at 392. His father was a violent man who frequently beat Rompilla's mother; he also beat Rompilla with his fists and other implements. *Id.* His father locked Rompilla and his brother in a small, excrement-filled dog pen. *Id.* Rompilla was not allowed to visit other children or to speak to anyone on the phone. *Id.* The family lived in extreme poverty. *Id.* They had no indoor plumbing, and Rompilla slept in the attic with no heat. *Id.* The children attended school in rags. *Id.* School and juvenile records further showed that Rompilla's IQ was in the mentally retarded range and that after nine years of school he had only a third grade level of cognition. *Id.* at 391, 393. Other information suggested a diagnosis of schizophrenia and other disorders. *Id.* at 391.

These unexamined records contained "red flags" that subsequently led to testing by mental health experts during Rompilla's postconviction proceedings. *Id.* at 392. The results of these tests revealed that Rompilla "suffer[ed] from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions." *Id.* His problems stemmed from his troubled childhood and were likely caused by fetal alcohol

syndrome. *Id.*  The experts also opined that Rompilla's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense. *Id.*

Weighing the information counsel should have presented but did not, the Supreme Court concluded: "This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury." *Id.* at 393.  There was a reasonable probability, therefore, that if the information had been presented, the jury would have reached a different conclusion at sentencing. *Id.*

Similarly, in *Wiggins* trial counsel failed to present evidence, readily available from school records and medical reports, of the defendant's "excruciating life history," 539 U.S. at 537, which involved "severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother" followed by "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care," *id.* at 535. Wiggins's background also featured periods of homelessness. *Id.* at 535. He suffered from "diminished mental capacities." *Id.*  In holding that Wiggins had demonstrated prejudice from counsel's performance at sentencing, the Court noted that this "powerful mitigating narrative," *id.* at 537, constituted the kind of "troubled history we have declared relevant to assessing a defendant's moral culpability," *id.* at  535.  If such information had been added to the case counsel did present at sentencing, which focused only on Wiggins's lack of a previous record and the fact that he accepted responsibility for the murder, there was a reasonable probability that the jury would have returned with a different sentence. *Id.* at 536.

In *Williams*, sentencing counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams's nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." 529 U.S. at  395.  Counsel thereby failed to present evidence that Williams's parents had been imprisoned for the criminal neglect of Williams and his siblings,

that Williams had been severely and repeatedly beaten by his father, that he had been committed to the custody of the social services bureau for two years during his parents' incarceration, and that he had spent time in an abusive foster home. *Id.* Counsel also failed to introduce evidence that Williams was "borderline mentally retarded" and did not advance in school beyond the sixth grade. *Id.* In addition, they failed to discover prison records that presented positive information about Williams, including commendations he had received for his role in helping to crack a prison drug ring and returning a guard's missing wallet, as well as the testimony of prison officials who described Williams as the "least likely [inmate] to act in a violent, dangerous or provocative way." *Id.* at 396. Such information, had counsel presented it at sentencing, "might well have influenced the jury's appraisal of [Williams's] moral culpability." *Id.* at 398.

Petitioner also cites a number of Ninth Circuit cases, including cases involving Petitioner's counsel, Lamar Couser, in which the court granted relief on sentencing-stage IAC claims. These cases are likewise distinguishable. In *Clabourne v. Lewis*, 64 F.3d 1375, 1384 (9th Cir. 1995), Mr. Couser's performance was found to be ineffective because "[h]e did not call any witnesses, introduce any evidence of Clabourne's history of mental illness, or argue any mitigating circumstance besides Clabourne's mental condition at the time of the offense." Instead, counsel argued that the evidence produced at trial concerning Clabourne's mental illness could be considered in mitigation of the sentence. *Id.* The Ninth Circuit noted, however, that the case counsel presented during the guilt stage of trial "was hardly sufficient to make a case for mitigation" because he called only one witness, "an expert he had contacted scant days earlier" and who "was wholly unprepared to testify as to Clabourne's mental state at the time of the offense; not having interviewed Clabourne, and having less than two days to prepare his testimony, [the expert] had to rely on vague recollections of having treated Clabourne some six years earlier." *Id.* Counsel's deficient performance resulted in a failure to develop key mitigation evidence, including information

indicating that Clabourne suffered from mental disorders that allowed him to be manipulated by his co-defendant into committing the crime. *Id.* at 1385-86.

As already noted, in contrast to his performance in *Clabourne*, here Mr. Couser presented evidence concerning Petitioner's mental state at both the guilt and sentencing stages of trial. This evidence was offered through the testimony of expert and lay witnesses, who detailed and explained Petitioner's impulsive character and the negative effect alcohol and drugs had on his personality. Further, unlike the expert in *Clabourne*, Drs. Allender and Breslow had personally examined Petitioner and reviewed his treatment records.

In *Wallace v. Stewart*, 184 F.3d 1112 (9th Cir. 1999), another case involving Mr. Couser, counsel failed to discover and provide to their mental health experts various test results and information about Wallace's background. The deficient performance left the sentencing judge with an incomplete and inaccurate picture of Wallace's history and mental health. Among the information omitted was the fact that Wallace came from "one of the most dysfunctional family backgrounds" his mental health expert had ever encountered, an environment that was "marred by an almost unimaginable level of chaos, neglect, bizarre and insane behavior, and extreme violence between the parents." *Id.* at 1116. Wallace's mother was a psychotic alcoholic; his father, also an alcoholic, beat Wallace's mother. *Id.* Wallace sniffed glue and gasoline daily between the ages of ten and twelve. *Id.* He experienced "clinically significant head traumas." *Id.* He also suffered from major depressive disorder and possibly organic brain disorder. *Id.* At the time of the murders, his ability to conform his conduct to the requirements of the law was "significantly impaired." *Id.*

The principal distinction between the cases relied upon by Petitioner and trial counsel's representation of Petitioner is that in the latter instance, counsel's performance did not result in the omission of vital mitigation information. To the extent that mitigating information about Petitioner's mental and neurological condition existed, counsel presented it, eliciting testimony that Petitioner had a personality trait of impulsivity, which was the

product of his narcissistic personality and exacerbated by his alcoholism and chemical dependency.

Principles discussed in other Supreme Court cases more readily apply to Petitioner's claim of sentencing-stage IAC.  These cases include *Woodford v. Visciotti*, 537 U.S. 19 (2002), *Bell v. Cone*, 535 U.S. 685 (2002), and *Schriro v. Landrigan*, 127 S. Ct. 1933 (2007).  In these cases, the Supreme Court, applying the deferential standards of the AEDPA, held that the state court did not unreasonably apply *Strickland* when it determined that the petitioner was not entitled to habeas relief based on sentencing counsel's performance.

In *Visciotti*, counsel failed to investigate and present readily available mitigating information consisting of potential organic brain damage, possible seizure disorder, extensive drug use beginning at the age of eight, and a "dysfunctional" family background characterized by violence between the parents, frequent moves, severe economic difficulties, and "continual psychological abuse."  *See Visciotti v. Woodford*, 288 F.3d 1097, 1109-14 (9th Cir. 2002).  Instead of developing and presenting such evidence, counsel attempted to create sympathy for Visciotti's family by calling his siblings and parents to testify during the penalty phase.[14]  *Id.* at 1103, 1115.  The California Supreme Court assumed, arguendo, that counsel's sentencing-stage performance was deficient but determined that Visciotti was not prejudiced.  *See* 537 U.S. at 26.  The Ninth Circuit disagreed, finding that the state supreme court's decision was unreasonable and contrary to *Strickland*, and that if counsel had not performed deficiently there was a reasonable probability that the jury would have returned with a life sentence.  288 F.3d at 1117-19.  The United States Supreme Court reversed, holding that the state supreme court properly considered the totality of available mitigating

---

[14]     During the guilt stage of trial, counsel had presented testimony that Visciotti "had minimal brain injury of a type associated with impulse disorders and specific learning disorders."  *Visciotti*, 288 F.3d at 1102.  However, the expert had been retained only three days prior to his testimony, and counsel had failed to provide him with any records.  *Id.* at 1110-11.

- 60 -

evidence and the prejudicial impact of counsel's performance at sentencing. 537 U.S. at 25-26. Citing *Bell v. Cone*, 535 U.S. at 699, 701, the Court explained that habeas relief was not "permissible under § 2254(d)" because the decision of the state court, notwithstanding any independent assessment rendered by a federal habeas court, was not objectively unreasonable. 537 U.S. at 26. Significantly, the mitigating information omitted by Visciotti's attorney was much stronger than the evidence Petitioner alleges was omitted by Mr. Couser during his sentencing.

In *Cone*, a jury convicted the defendant of murdering an elderly couple and sentenced him to death after a hearing in which defense counsel presented no witnesses and made no closing argument. 535 U.S. at 691. Instead, counsel cross-examined the prosecution's witnesses and directed the jury's attention to mitigation evidence that had already been presented in the guilt phase of the trial, including the defendant's drug addiction and mental problems. *Id.* The Supreme Court determined that Cone's IAC claim could not satisfy the deferential standards set forth in the AEDPA. *Id.* at 698-99.

Like Petitioner's trial counsel, Cone's attorney "was faced with the formidable task of defending a client who had committed a horribly brutal and senseless crime." *Id.* Like Petitioner's counsel, Cone's attorney presented a defense at the guilt stage of the trial based on Petitioner's mental state, so that "he was able to put before the jury extensive testimony about what he believed to be the most compelling mitigation evidence in the case," including evidence about Petitioner's history of drug and alcohol abuse and its effects on him at the time of the crimes. *Id.* Like Petitioner's counsel, at sentencing Cone's attorney argued for mitigation based on his client's insufficient capacity. *Id.* at 699-700. Unlike Cone's attorney, however, Petitioner's counsel also presented expert testimony at sentencing to address the issue of his client's mental health and offered a closing argument.

Finally, in *Landrigan*, the Supreme Court held that counsel's failure to adequately investigate and develop potential mitigating was not prejudicial because such evidence was

- 61 -

"weak." 127 S. Ct. at 1944.  This evidence included Landrigan's exposure to alcohol and drugs in utero, abandonment by his biological mother, his own drug and alcohol abuse, his family's history of violence, and a possible genetic predisposition to violence. *Id.* at 1943. Nevertheless, the Court concluded that there was no reasonable probability that presentation of the additional evidence would have changed the outcome at sentencing. *Id.* at 1944. Again, this "weak" evidence was more substantial than any mitigating information now offered or suggested by Petitioner.

Based upon a review of clearly-established federal law, Petitioner was not prejudiced by counsel's performance at sentencing.  The Court has assessed prejudice with respect to Petitioner's sentencing-stage IAC claims by reevaluating Petitioner's sentence in the light of the evidence introduced in these habeas proceedings.  The new information is largely inconclusive or cumulative, such that it "barely . . . alter[s] the sentencing profile presented to the sentencing judge." *Strickland*, 466 U.S. at 700; *see Babbitt v. Calderon*, 151 F.3d 1170, 1175 (9th Cir. 1998) (no prejudice where counsel failed to present cumulative mitigating evidence).  The trial court was presented with information concerning each area of mitigation now urged by Petitioner – his impulsive personality, history of drug and alcohol abuse, and chaotic family background.  Petitioner has failed to affirmatively demonstrate that, but for counsel's failure to present additional mitigating information, there exists a reasonable probability that the trial court would not have sentenced Petitioner to death.

Finally, applying the additional level of deference mandated by the AEDPA, the PCR court's denial of this claim did not constitute an unreasonable application of *Strickland*. Therefore, Petitioner is not entitled to relief on Claim 10-C(3)(a).

## B.    Failure to Prepare for Presentence Interview

Petitioner alleges in Claim 10-C(3)(b) that counsel failed to prepare him for his presentence interview with a probation officer and that such failure amounted to constitutionally ineffective assistance.  (Dkts. 24 at 143-45, 69 at 28.)

During the PCR proceedings, Petitioner filed an affidavit stating that Mr. Couser "never counseled me on the preparation of the presentence report." (ROA-PCR 1010.) The PCR court nevertheless rejected this claim:

> The Court finds that although Mr. Couser's deposition testimony contradicts the Petitioner's claim that he was not counseled in preparation for the presentence interview, even assuming the facts to be as alleged, the Petitioner has failed to show a reasonable probability that the outcome would have been meaningfully altered had he been counseled. The petition raises only one specific issue, the expression of remorse, on which pre-interview counseling might have aided the Petitioner. However, the Petitioner did include expressions of remorse in a letter delivered by counsel to Judge Meehan on the day of sentencing. In the absence of a showing that the Petitioner was prejudiced by the presumed failure to counsel his client before the interview, the claim is denied.

(ME 6/6/97 at 8.)

As the PCR court noted, Petitioner's contention about this aspect of counsel's performance does not comport with the averments of Mr. Couser in a deposition conducted during the state post-conviction relief proceedings. (*See* Dkt. 25, Ex. 16; RT 2/16/96 at 109-10.) During his deposition, counsel conceded that he had no specific recollection of what he told Petitioner about the presentence interview process; he explained, however, that it was his general practice to discuss such matters with his clients and was "sure I must have" with Petitioner as well. *Id.* Petitioner's self-serving, uncorroborated assertion to the contrary is the only support for the proposition that his attorney did not counsel him concerning the preparation of the presentence report.

Even if Petitioner's assertion about counsel's performance were verified, Petitioner cannot show that he suffered prejudice as a result of his trial counsel's actions or inactions. Petitioner asserts that with the proper guidance from trial counsel, he would have expressed greater remorse during the presentence interview. (Dkt. 24 at 144.) In fact, Petitioner felt no remorse and it was not incumbent upon counsel to manufacture remorse or prompt

Petitioner to express such feelings where none existed.[15]  In any event, as the PCR court noted, Petitioner did express remorse in a letter submitted to the sentencing judge. (Dkt. 25, Ex. 6.)  Moreover, the court did not consider Petitioner's lack of remorse in the presentence report as a factor in sentencing Petitioner. (ME 7/12/91.)   Thus, Petitioner cannot demonstrate prejudice from counsel's performance because he "has failed to show that the information relative to remorse contained in the presentence report had any effect on the sentencing court's decision to impose the death penalty." *Clark v. Ricketts*, 958 F.2d 851, 857-58 (9th Cir. 1991). The PCR court's denial of this claim was not an unreasonable application of *Strickland*.

### C.    Failure to Present Military Service as Mitigation

Petitioner asserts in Claim 10-C(3)(d) that counsel's performance at sentencing was ineffective because he failed to urge Petitioner's military service as a mitigating circumstance. (Dkts. 24 at 146-47, 69 at 28.)  The facts are to the contrary.  As noted above, counsel presented the entirety of Petitioner's military records for consideration by the trial court.  The sentencing judge is presumed to have known and applied the law correctly, *Walton v. Arizona*, 496 U.S. 639, 653 (1990), which meant giving consideration to any mitigating evidence. Furthermore, any additional focus on the positive aspects of the records could have proved to have a "double edge" effect, *Wiggins*, 539 U.S. at  535, opening the door for the prosecutor to note the instances of misconduct resulting in disciplinary action and loss of rank.  The PCR court did not apply *Strickland* unreasonably when it rejected this

---

[15]    The presentence report quotes Petitioner's feelings with respect to remorse as follows:

> I have no remorse for that family.  After the jury verdict was announced the mother (Peggy Dietz) stood and raised her fist as if to say they'd won.  They didn't win anything. I'm alive and they're dead.  The only thing that still hurts is that I won't see Deb anymore.

(ROA-PCR 1287.)

1    claim.

2    **D.     Cumulative Impact**

3    Petitioner alleges in Claim 10-D that his constitutional rights were violated by the

4    cumulative impact of IAC as alleged in Claims 10-B and 10-C.  (Dkts. 24 at 147, 69 at 31.)

5    The Court has considered Petitioner's individual claims of sentencing error and found none

6    supportable.  Accordingly, Petitioner's assertion of cumulative error also fails.

7    **VI.     Ineffective Assistance of Appellate Counsel**

8    Petitioner alleges in Claim 11-B that appellate counsel rendered ineffective assistance

9    in preparing the appellate brief.  (Dkts. 24 at 148-64, 69 at 31-33.)  Specifically, he contends

10   that appellate counsel failed to properly brief his claims of evidentiary error and identify

11   separate grounds of prosecutorial misconduct.

12   Appellate counsel filed a 100-page opening brief.  The Arizona Supreme Court

13   commented on the quality of the brief, noting, with respect to claims of evidentiary error, that

14   the brief consisted of fourteen pages of excerpts from trial testimony as to which "appellate

15   counsel has failed to articulate separate grounds of objection."  *Wood*, 180 Ariz. at 61, 881

16   P.2d at 1166.  Faced with this "unhelpful appellate practice," the Arizona Supreme Court

17   examined Petitioner's evidentiary claims for fundamental error.  *Id.* at n.3.  Alleging that the

18   prosecutor "ran amok," appellate counsel also raised several specific claims of prosecutorial

19   misconduct, including those set forth in habeas Claims 1-B(1), 1-B(2)(a), 1-B(5), and 1-B(7).

20   (Opening Brief at 60-66.)

21   The PCR court denied this claim, finding that appellate counsel's performance was

22   neither deficient nor prejudicial.  (ME 6/6/97 at 10.)

23   <u>Analysis</u>

24   The Fourteenth Amendment guarantees a criminal defendant the right to effective

25   assistance of counsel on his first appeal as of right.  *Evitts v. Lucey*, 469 U.S. 387, 391-405

26   (1985).  A claim of ineffective assistance of appellate counsel is reviewed according to the

27

28                                                    - 65 -

standard set out in *Strickland.  See Miller v. Keeney*, 882 F.2d 1428, 1433-34 (9th Cir. 1989).
Petitioner must show that counsel's appellate advocacy fell below an objective standard of
reasonableness and that there is a reasonable probability that, but for counsel's deficient
performance, Petitioner would have prevailed on appeal.  *See Smith v. Robbins*, 528 U.S.
259, 285-86 (2000); *see also Miller*, 882 at 1434 n.9 (citing *Strickland*, 466 U.S. at 688, 694).

As the Arizona Supreme Court noted, Petitioner's criticisms of the opening brief's
format are well-taken.  With respect to the claims of evidentiary error, for example, appellate
counsel fails to offer detailed analysis (Opening Brief at 19-38); the factual bases for some
claims of prosecutorial misconduct likewise are not detailed (*id.* at 65-66).  However, under
*Strickland*, the standard for effective performance is not perfect advocacy.  *See Dows v.
Wood*, 211 F.3d 480, 487 (9th Cir. 2000).   Instead, counsel's performance "must be only
objectively reasonable, not flawless or to the highest degree of skill."  *Id.*   Ultimately,
however, the Court again finds it unnecessary to determine whether appellate counsel's
performance was objectively reasonable because Petitioner has clearly failed to satisfy
*Strickland*'s second prong.

Petitioner has made no showing that he would have prevailed on appeal if appellate
counsel had presented his claims in a more substantive and organized fashion.  Instead,
Petitioner has simply described the deficiencies in appellate counsel's brief and concluded
that they entitle him to relief.  These conclusory allegations are insufficient to establish
prejudice. *See Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir. 1989) (general complaints
about the quality of the appellate brief are not sufficient to establish prejudice).  Petitioner
has provided no basis for his contention that a more coherent presentation of the same issues
was reasonably likely to have led to a reversal.

Petitioner cites *Howard v. Gramley*, 225 F.3d 784 (7th Cir. 2000).  The decision in
*Howard*, however, supports a determination that Petitioner is not entitled to relief on this
claim.  Although the Seventh Circuit found that appellate counsel's performance was

- 66 -

deficient because he failed to raise the issue of prosecutorial misconduct, the court did not grant relief, holding that the petitioner was not prejudiced by counsel's failures because "there is no reason to think that presenting these arguments to the Illinois appellate courts would have increased the likelihood of reversal." *Id.* at 793. In the present case, appellate counsel did in fact raise claims of prosecutorial misconduct (Opening Brief at 60-66) as well as claims of evidentiary error (*id.* at 19-38). Although appellate counsel may have presented many of the claims in a perfunctory and poorly-organized manner, the Arizona Supreme Court did consider the claims. *Wood*, 180 Ariz. at 61-68, 881 P.2d at 1166-73. A more artful presentation by appellate counsel would not have transformed the merits of the claims such that the outcome of the appeal would have been different.

For the reasons stated above, the decision of the PCR court denying Petitioner's claim of appellate IAC was not an unreasonable application of *Strickland*. Therefore, Petitioner is not entitled to relief on Claim 11-B.

## EVIDENTIARY DEVELOPMENT

Petitioner seeks an evidentiary hearing, evidentiary development, and expansion of the record. (Dkt. 69 at 33-41.) He also seeks resources, in the form of a mitigation specialist and a neuropsychologist, asserting that such resources are "necessary to assist Petitioner in demonstrating the prejudice resulting from [trial] counsel's errors: the mental health evidence which should have been discovered and presented to Dr. Allender to support Petitioner's defense to first-degree murder and to establish the mitigation discussed [in Petitioner's memorandum on the merits]." (*Id.* at 38-39.) Petitioner asserts that he was diligent in developing the factual bases of his claims in state court because he sought an evidentiary hearing and requested expert funds. (*Id.* at 34-36.) Respondents counter that Petitioner was not diligent in state court and therefore is not entitled to a hearing or expansion of the record. (Dkt. 74 at 64-71.)

Legal Principles

In evaluating Petitioner's requests, the Court applies the relevant provisions of 28 U.S.C. § 2254(e)(2):

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> (A) the claim relies on –
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Section 2254(e)(2) similarly limits a petitioner's ability to present new evidence through a motion to expand the record pursuant to Rule 7 of the Rules Governing Section 2254 Cases.[16] *See Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005) (holding that the conditions of § 2254(e)(2) generally apply to petitioners seeking relief based on new evidence, even when they do not seek an evidentiary hearing) (citing *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (per curiam)).

The Supreme Court has interpreted subsection (e)(2) as precluding an evidentiary hearing in federal court if the failure to develop a claim's factual basis is due to a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). A hearing is not barred, however, when a petitioner diligently attempts to develop the factual basis of a claim in state court and is

---

[16]     Rule 7 authorizes a federal habeas court to expand the record to include additional material relevant to the determination of the merits of a petitioner's claims. "The materials that may be required include letters predating the filing of the petition, documents, exhibits, and answers under oath, to written interrogatories propounded by the judge. Affidavits may also be submitted and considered as part of the record." Rule 7(b), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

"thwarted, for example, by the conduct of another or by happenstance was denied the opportunity to do so." *Id.*; *see also Baja v. Ducharme*, 187 F.3d 1075, 1078-79 (9th Cir. 1999) (allowing hearing when state court denied opportunity to develop factual basis of claim).

The diligence assessment is an objective one, requiring a determination of whether a petitioner "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Williams*, 529 U.S. at 435.  For example, when there is information in the record that would alert a reasonable attorney to the existence and importance of certain evidence, the attorney fails to develop the factual record if he does not make reasonable efforts to sufficiently investigate and present the evidence to the state court. *See id*. at 438-39, 442; *Alley v. Bell*, 307 F.3d 380, 390-91 (6th Cir. 2002).  Absent unusual circumstances, diligence requires that a petitioner "at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Williams*, 529 U.S. at 437; *see also Bragg v. Galaza*, 242 F.3d 1082, 1090 (9th Cir.), *amended on denial of reh'g*, 253 F.3d 1150 (9th Cir. 2001).  The mere request for an evidentiary hearing, however, may not be sufficient to establish diligence if a reasonable person would have taken additional steps. *See Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000) (counsel failed to present affidavits of family members that were easily obtainable without court order and with minimal expense); *Koste v. Dormire*, 345 F.3d 974, 985-86 (8th Cir. 2003); *McNair v. Campbell*, 416 F.3d 1291, 1299-1300 (11th Cir. 2005).

Pursuant to *Townsend v. Sain*, 372 U.S. 293, 312-13 (1963), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *and limited by* § 2254 (e)(2), a federal district court must hold an evidentiary hearing in a § 2254 case when: (1) the facts are in dispute; (2) the petitioner "alleges facts which, if proved, would entitle him to relief;" and (3) the state court has not "reliably found the relevant facts" after a "full and fair evidentiary hearing," at trial or in a collateral proceeding.  *See also Hill v. Lockhart*, 474 U.S. 52, 60 (1985)

(upholding the denial of a hearing when petitioner's allegations were insufficient to satisfy the governing legal standard); *Bashor v. Risley*, 730 F.2d 1228 (9th Cir. 1984) (hearing not required when claim must be resolved on state court record or claim is based on non-specific conclusory allegations); *see also Landrigan*, 127 S. Ct. at 1940 ("Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate.").

Analysis

During the PCR proceedings Petitioner requested, but did not receive, an evidentiary hearing on his IAC claims.  (*See* RT 11/6/96 at 3, 6; ME 11/6/96.)  As discussed above, he also attached a number of exhibits to his PCR petition, including affidavits from Dr. Allender.  Arguably, these efforts constituted a diligent attempt to develop the factual basis for Petitioner's claims.  However, even assuming Petitioner diligently sought to develop the claims in state court, an evidentiary hearing is unnecessary because he has not alleged the existence of disputed facts which, if true, would entitle him to relief.  *Townsend*, 372 U.S. at 312-13.[17]

Petitioner contends that he was prejudiced by counsel's deficient handling of mental health evidence at both the guilt and sentencing stages of trial.  The merits of that contention can be resolved without further evidentiary development.  The record adequately details counsel's performance, including his effort to investigate, prepare, and present a guilt-stage defense based on Petitioner's character trait of impulsivity.  Therefore, because his IAC claims can be "resolved by reference to the state court record," Petitioner is not entitled to an evidentiary hearing. *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998); *see also*

---

[17]    This conclusion is not affected by the Court's consideration of the exhibits attached to the habeas petition, with which Petitioner seeks to expand the state court record. Of the sixteen exhibits, only Dr. Walters's report and the collection of Petitioner's report cards constitute new information relevant to Petitioner's IAC claims. (Dkt. 25, Ex's 7, 9.)

*Griffey v. Lindsey*, 345 F.3d 1058, 1067 (9th Cir. 2003) (hearing is not warranted if Petitioner's claims can "be resolved by reference to the state court record and the documentary evidence); *Cardwell v. Greene*, 152 F.3d 331, 338-39 (4th Cir. 1998) (denying an evidentiary hearing on IAC claims where the petitioner "failed to forecast any evidence beyond that already contained in the record, or otherwise explain how his claim would be advanced by an evidentiary hearing.").

In *Totten*, the Ninth Circuit held that the petitioner was not entitled to an evidentiary hearing to determine whether trial counsel's decision not to pursue a mental impairment defense was deficient because Petitioner had failed to show that a hearing would shed new light on the question of prejudice. *Id.* at 1176-77. The record demonstrated that an impairment defense was wholly inconsistent with the petitioner's deliberate actions in committing the offenses and thus would have been unlikely to alter the verdict. *Id.* Similarly, as discussed above, Petitioner has not shown that an evidentiary hearing would produce any new information concerning Petitioner's mental state that could have affected the jury's finding of premeditation. To the contrary, counsel presented the testimony of a neuropsychologist and lay witnesses who described Petitioner's impulsive personality. The jury nevertheless convicted Petitioner of first degree murder based on the "clear quantum" of evidence of premeditation. *Wood*, 180 Ariz. At 65, 881 P.2d at 1170.

The same analysis applies to Petitioner's claims of IAC at sentencing. Counsel argued and presented testimony that Petitioner's ability to conform his conduct to the requirements of law was diminished by his alcohol and drug abuse coupled with his impulsive personality. Dr. Walters's affidavit adds only further speculation that Petitioner suffers from organic brain damage along with a call for diagnostic testing. As discussed above, based on the recommendation of Dr. Breslow, counsel moved for such testing and presented Dr. Breslow's testimony regarding the causes of Petitioner's impulsivity. (ROA 471.) The record, which contains, among other items, all of the reports prepared by the mental health experts who had

evaluated Petitioner, is sufficient to resolve this claim.  *See Johnson v. Luebbers*, 288 F.3d 1048, 1058-60 (8th Cir. 2002) (district court did not abuse its discretion in denying habeas corpus petitioner's request for an evidentiary hearing on claim that his counsel was ineffective for failing to present mitigating evidence of petitioner's mental health and diminished mental capacity where record already contained facts necessary to resolve claim). A review of the entire record indicates that the facts alleged by Petitioner, even if proved true, would not entitle him to relief on his claim that the PCR court unreasonably applied *Strickland* in denying his IAC claims.  *See Landrigan*, 127 S. Ct at 1940.  Therefore, Petitioner is not entitled to an evidentiary hearing.

### CERTIFICATE OF APPEALABILITY

In the event Petitioner appeals from this Court's judgment, and in the interests of conserving scarce Criminal Justice Act funds that might be consumed drafting an application for a certificate of appealability to this Court, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability ("COA") or state the reasons why such a certificate should not issue.  Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's

1 procedural ruling was correct.  *Id.*

2   The Court finds that reasonable jurists, applying the deferential standard of review set

3 forth in the AEDPA, which requires this Court to evaluate state court decisions in the light

4 of clearly established federal law as determined by the United States Supreme Court, could

5 not debate its resolution of the merits of Petitioner's claims as set forth in this Order.

6 Further, for the reasons stated in the Court's Order regarding the procedural status of

7 Petitioner's claims filed on March 3, 2006 (Dkt. 63), the Court declines to issue a COA with

8 respect to any claims that were found to be procedurally barred.

9                                              **CONCLUSION**

10   For the reasons set forth above, Petitioner is not entitled to habeas relief.  The Court

11 further finds that an evidentiary hearing in this matter is neither warranted nor required.

12   Accordingly,

13   **IT IS ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus

14 (Dkt. 23) is **DENIED**.  The Clerk of Court shall enter judgment accordingly.

15   **IT IS FURTHER ORDERED DENYING** a Certificate of Appealability.

16   **IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order

17 to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix,

18 AZ 85007-3329.

19   DATED this 19th day of October, 2007.

20

21

22

23

24

25 _____
26                    John M. Roll
27         Chief United States District Judge

28
                                              - 73 -